# CALIFORNIA BANKERS ASSN. *v.* SHULTZ, SECRETARY OF THE TREASURY, ET AL.

No. 72–985. Argued January 16, 1974—Decided April 1, 1974*

---

*Together with No. 72–1073, *Shultz, Secretary of the Treasury, et al.* v. *California Bankers Assn. et al.;* and No. 72–1196, *Stark et al.* v. *Shultz, Secretary of the Treasury, et al.,* also on appeal from the same court.

22

24

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, BLACKMUN, and POWELL, JJ., joined. POWELL, J., filed a concurring opinion, in which BLACKMUN, J., joined, *post*, p. 78. DOUGLAS, J., filed a dissenting opinion, in Parts I and II-A of which BRENNAN, J., joined, *post*, p. 79. BRENNAN, J., *post*, p. 91, and MARSHALL, J., *post*, p. 93, filed dissenting opinions.

*John H. Anderson* argued the cause for the California Bankers Assn., appellant in No. 72–985 and appellee in No. 72–1073. With him on the briefs was *Frederick M. Pownall.*

*Charles C. Marson* argued the cause for Stark et al., appellants in No. 72–1196 and appellees in No. 72–1073. With him on the briefs were *Joseph Remcho, Neil Horton, Anthony G. Amsterdam, Melvin L. Wulf, Burt Neuborne,* and *Hope Eastman.*

*Deputy Solicitor General Wallace* argued the cause for Shultz et al., appellants in No. 72–1073 and appellees in Nos. 72–985 and 72–1196. With him on the briefs were *Solicitor General Bork, Assistant Attorney General Crampton, Edward R. Korman,* and *Leonard J. Henzke, Jr.*

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

These appeals present questions concerning the constitutionality of the so-called Bank Secrecy Act of 1970 (Act), and the implementing regulations promulgated thereunder by the Secretary of the Treasury. The Act, Pub. L. 91–508, 84 Stat. 1114, 12 U. S. C. §§ 1730d, 1829b,

1951–1959, and 31 U. S. C. §§ 1051–1062, 1081–1083, 1101–1105, 1121–1122, was enacted by Congress in 1970 following extensive hearings concerning the unavailability of foreign and domestic bank records of customers thought to be engaged in activities entailing criminal or civil liability. Under the Act, the Secretary of the Treasury is authorized to prescribe by regulation certain recordkeeping and reporting requirements for banks and other financial institutions in this country. Because it has a bearing on our treatment of some of the issues raised by the parties, we think it important to note that the Act's civil and criminal penalties attach only upon violation of regulations promulgated by the Secretary; if the Secretary were to do nothing, the Act itself would impose no penalties on anyone.

The express purpose of the Act is to require the maintenance of records, and the making of certain reports, which "have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings." 12 U. S. C. §§ 1829b (a)(2), 1951; 31 U. S. C. § 1051. Congress was apparently concerned with two major problems in connection with the enforcement of the regulatory, tax, and criminal laws of the United States.[1]

First, there was a need to insure that domestic banks and financial institutions continue to maintain adequate records of their financial transactions with their customers. Congress found that the recent growth of financial institutions in the United States had been paralleled by an increase in criminal activity which made use of

---

[1] See generally S. Rep. No. 91–1139 (1970); H. R. Rep. No. 91–975 (1970); Hearings on Foreign Bank Secrecy and Bank Records (H. R. 15073) before the House Committee on Banking and Currency, 91st Cong., 1st and 2d Sess. (1969–1970); Hearings on Foreign Bank Secrecy (S. 3678 and H. R. 15073) before the Subcommittee on Financial Institutions of the Senate Committee on Banking and Currency, 91st Cong., 2d Sess. (1970).

these institutions. While many of the records which the Secretary by regulation ultimately required to be kept had been traditionally maintained by the voluntary action of many domestic financial institutions, Congress noted that in recent years some larger banks had abolished or limited the practice of photocopying checks, drafts, and similar instruments drawn on them and presented for payment. The absence of such records, whether through failure to make them in the first instance or through failure to retain them, was thought to seriously impair the ability of the Federal Government to enforce the myriad criminal, tax, and regulatory provisions of laws which Congress had enacted. At the same time, it was recognized by Congress that such required records would "not be made automatically available for law enforcement purposes [but could] only be obtained through existing legal process." H. R. Rep. No. 91–975, p. 10 (1970); see S. Rep. No. 91–1139, p. 5 (1970).

In addition, Congress felt that there were situations where the deposit and withdrawal of large amounts of currency or of monetary instruments which were the equivalent of currency should be actually reported to the Government. While reports of this nature had been required by previous regulations issued by the Treasury Department, it was felt that more precise and detailed reporting requirements were needed. The Secretary was therefore authorized to require the reporting of what may be described as large domestic financial transactions in currency or its equivalent.

Second, Congress was concerned about a serious and widespread use of foreign financial institutions, located in jurisdictions with strict laws of secrecy as to bank activity, for the purpose of violating or evading domestic criminal, tax, and regulatory enactments. The House

28

Report on the bill, No. 91–975, *supra,* at 12–13, described the situation in these words:

"Considerable testimony was received by the Committee from the Justice Department, the United States Attorney for the Southern District of New York, the Treasury Department, the Internal Revenue Service, the Securities and Exchange Commission, the Defense Department and the Agency for International Development about serious and widespread use of foreign financial facilities located in secrecy jurisdictions for the purpose of violating American law. Secret foreign bank accounts and secret foreign financial institutions have permitted proliferation of 'white collar' crime; have served as the financial underpinning of organized criminal operations in the United States; have been utilized by Americans to evade income taxes, conceal assets illegally and purchase gold; have allowed Americans and others to avoid the law and regulations governing securities and exchanges; have served as essential ingredients in frauds including schemes to defraud the United States; have served as the ultimate depository of black market proceeds from Vietnam; have served as a source of questionable financing for conglomerate and other corporate stock acquisitions, mergers and takeovers; have covered conspiracies to steal from the U. S. defense and foreign aid funds; and have served as the cleansing agent for 'hot' or illegally obtained monies.

"The debilitating effects of the use of these secret institutions on Americans and the American economy are vast. It has been estimated that hundreds of millions in tax revenues have been lost. Unwarranted and unwanted credit is being pumped into

our markets. There have been some cases of corporation directors, officers and employees who, through deceit and violation of law, enriched themselves or endangered the financial soundness of their companies to the detriment of their stockholders. Criminals engaged in illegal gambling, skimming, and narcotics traffic are operating their financial affairs with an impunity that approaches statutory exemption.

"When law enforcement personnel are confronted with the secret foreign bank account or the secret financial institution they are placed in an impossible position. In order to receive evidence and testimony regarding activities in the secrecy jurisdiction they must subject themselves to a time consuming and ofttimes fruitless foreign legal process. Even when procedural obstacles are overcome, the foreign jurisdictions rigidly enforce their secrecy laws against their own domestic institutions and employees.

"One of the most damaging effects of an American's use of secret foreign financial facilities is its undermining of the fairness of our tax laws. Secret foreign financial facilities, particularly in Switzerland, are available only to the wealthy. To open a secret Swiss account normally requires a substantial deposit, but such an account offers a convenient means of evading U. S. taxes. In these days when the citizens of this country are crying out for tax reform and relief, it is grossly unfair to leave the secret foreign bank account open as a convenient avenue of tax evasion. The former U. S. Attorney for the Southern District of New York has characterized the secret foreign bank account as the largest single tax loophole permitted by American law."

While most of the recordkeeping requirements imposed

by the Secretary under the Act merely require the banks to keep records which most of them had in the past voluntarily kept and retained, and while much of the required reporting of domestic transactions had been required by earlier Treasury regulations in effect for nearly 30 years,[2] there is no denying the impressive sweep of the authority conferred upon the Secretary by the Bank Secrecy Act of 1970. While an Act conferring such broad authority over transactions such as these might well surprise or even shock those who lived in an earlier era, the latter did not live to see the time when bank accounts would join chocolate, cheese, and watches as a symbol of the Swiss economy. Nor did they live to see the heavy utilization of our domestic banking system by the minions of organized crime as well as by millions of legitimate businessmen. The challenges made here to the Bank Secrecy Act are directed not to any want of legislative authority in Congress to treat the subject, but instead to the Act's asserted violation of specific constitutional prohibitions.

## I

Title I of the Act, and the implementing regulations promulgated thereunder by the Secretary of the Treasury, require financial institutions to maintain records of the identities of their customers, to make microfilm copies of certain checks drawn on them, and to keep records of certain other items. Title II of the Act and its implementing regulations require reports of certain domestic and foreign currency transactions.

### A. TITLE I—THE RECORDKEEPING REQUIREMENTS

Title I of the Act contains the general recordkeeping requirements for banks and other financial

---

[2] See n. 11, *infra.*

institutions, as provided by the Secretary by regulation. Section 101 of the Act, 12 U. S. C. § 1829b, applies by its terms only to federally insured banks. It contains congressional findings "that adequate records maintained by insured banks have a high degree of usefulness in criminal, tax, and regulatory investigations and proceedings." The major requirements of the section are that insured banks record the identities of persons having accounts with them and of persons having signature authority thereover, in such form as the Secretary may require. To the extent that the Secretary determines by regulation that such records would have the requisite "high degree of usefulness," the banks must make and maintain microfilm or other reproductions of each check, draft, or other instrument drawn on it and presented to it for payment, and must maintain a record of each check, draft, or other instrument received by it for deposit or collection, together with an identification of the party for whose account it is to be deposited or collected. Section 101 further authorizes the Secretary to require insured banks to maintain a record of the identity of all individuals who engage in transactions which are reportable by the bank under Title II of the Act, and authorizes the Secretary to prescribe the required retention period for such records. Section 102, 12 U. S. C. § 1730d, amends the National Housing Act to authorize the Secretary to apply similar recordkeeping requirements to institutions insured thereunder. Sections 122–123 of the Act, 12 U. S. C. §§ 1952–1953, authorize the Secretary to issue regulations applying similar recordkeeping requirements to additional domestic financial institutions.[3]

---

[3] Under § 123 (b), 12 U. S. C. § 1953 (b), the authority of the Secretary extends to any person engaging in the business of:

"(1) Issuing or redeeming checks, money orders, travelers' checks,

Although an initial draft of Title I, see H. R. 15073, 91st Cong., 1st Sess., would have compelled the Secretary to promulgate regulations requiring banks to maintain copies of all items received for collection or presented for payment, the Act as- finally passed required the maintenance only of such records and microfilm copies as the Secretary determined to have a "high degree of usefulness." [4] Upon passage of the Act, the Treasury Department established a task force which consulted with representatives from financial institutions, trade associations, and governmental agencies to determine the type of records which should be maintained. Whereas the original regulations promulgated by the Secretary had required the copying of all checks, the task force decided, and the regulations were accordingly amended, to require check copying only as to checks in excess of $100.[5] The regulations also require the copying of

---

or similar instruments, except as an incident to the conduct of its own nonfinancial business.

"(2) Transferring funds or credits domestically or internationally.

"(3) Operating a currency exchange or otherwise dealing in foreign currencies or credits.

"(4) Operating a credit card system.

"(5) Performing such similar, related, or substitute functions for any of the foregoing or for banking as may be specified by the Secretary in regulations."

Section 122 of the Act, 12 U. S. C. § 1952, authorizes the Secretary to require reports with respect to the ownership, control, and management of uninsured domestic financial institutions.

[4] See House Hearings, supra, n. 1, at 60–61; 80. 146, 162, 314, 316, 321, 333; S. Rep. No. 91–1139, supra, at 18–19 (supplemental views).

[5] For a summary of the task force study, see Hearings to amend the Bank Secrecy Act (S. 3814 and S. 3828) before the Subcommittee on Financial Institutions of the Senate Committee on Banking, Housing and Urban Affairs, 92d Cong., 2d Sess., 60–64 (1972). The Secretary initially issued regulations on April 5, 1972, implementing the provisions of the Act. See 31 CFR pt. 103 (37 Fed.

only "on us" checks: checks drawn on the bank or issued and payable by it. 31 CFR § 103.34 (b)(3). The regulations exempt from the copying requirements certain "on us" checks such as dividend, payroll, and employee benefit checks, provided they are drawn on an account expected to average at least one hundred checks per month.[6] The regulations also require banks to maintain records of the identity and taxpayer identification number of each person maintaining a financial interest in each deposit or share account opened after June 30, 1972, and to microfilm various other financial documents. 31 CFR § 103.34.[7] In addition, the

Reg. 6912). The Treasury Department task force found that law enforcement would not be greatly impaired by limiting the check-copying requirement to checks in excess of $100. An Assistant Secretary of the Treasury estimated that this exclusion would eliminate 90% of all personal checks from the microfilming requirement. Senate Hearings on S. 3814, *supra*, at 42, 44, 57–58. The regulations were thus amended shortly after their promulgation to exclude the copying of checks drawn for $100 or less. 31 CFR § 103.34 (b)(3), as amended, 37 Fed. Reg. 23114 (1972), 38 Fed. Reg. 2174 (1973), effective Jan. 17, 1973.

[6] Exempted by 31 CFR § 103.34 (b)(3) are dividend checks, payroll checks, employee benefit checks, insurance claim checks, medical benefit checks, checks drawn on governmental agency accounts, checks drawn by brokers or dealers in securities, checks drawn on fiduciary accounts, checks drawn on other financial institutions, and pension or annuity checks, provided they are drawn on an account expected to average at least one hundred checks per month.

[7] Title 31 CFR § 103.34 (b) requires that each bank retain either the original or a microfilm or other copy or reproduction of (1) documents granting signature authority over accounts; (2) statements or ledger cards showing transactions in each account; (3) each item involving more than $10,000 remitted or transferred to a person, account, or place outside the United States; (4) a record of each remittance or transaction of funds, currency, monetary instruments, checks, investment securities, or credit, of more than $10,000 to a person, account, or place outside the United States; (5) each check

34

Secretary's regulations require all financial institutions to maintain a microfilm or other copy of each extension of credit in an amount exceeding $5,000 except those secured by interest in real property, and to microfilm each advice, request, or instruction given or received regarding the transfer of funds, currency, or other money or credit in amounts exceeding $10,000 to a person, account, or place outside the United States.' 31 CFR § 103.33.

Reiterating the stated intent of the Congress, see, *e. g.*, H. R. Rep. No. 91–975, *supra*, at 10; S. Rep. No. 91–1139, *supra*, at 5, the regulations provide that inspection, review, or access to the records required by the Act to be maintained is governed by existing legal process. 31 CFR § 103.51.[8] Finally, §§ 125–127 of the Act provide

---

or draft in an amount exceeding $10,000 drawn on or issued by a foreign bank which the domestic bank has paid or presented to a nonbank drawee for payment; (6) each item of more than $10,000 received directly from a bank, broker, or dealer in foreign exchange outside the United States; (7) a record of each receipt of currency, monetary instruments, checks, or investment securities, and each transfer of funds or credit in amounts exceeding $10,000 received directly from a bank, broker, or dealer in foreign exchange outside the United States; (8) records needed to reconstruct a demand deposit account and to trace checks in excess of $100 deposited in such account.

Title 31 CFR § 103.35 requires brokers and dealers in securities to maintain similar information with respect to their brokerage accounts.

The prescribed retention period for all records under the regulations is five years, except for the records required for reconstructing a demand deposit account, which must be retained for only two years. 31 CFR § 103.36 (c).

[8] Title 31 CFR § 103.51 provides:

"Except as provided in §§ 103.34 (a) (1) and 103.35 (a) (1), and except for the purpose of assuring compliance with the record-keeping and reporting requirements of this part, this part does not authorize the Secretary or any other person to inspect or review

for civil and criminal penalties for willful violations of the recordkeeping requirements. 12 U. S. C. §§ 1955–1957.

## B. Title II—Foreign Financial Transaction Reporting Requirements

Chapter 3 of Title II of the Act and the regulations promulgated thereunder generally require persons to report the transportation of monetary instruments into or out of the United States, or receipts of such instruments in the United States from places outside the United States, if the transportation or receipt involves instruments of a value greater than $5,000. Chapter 4 of Title II of the Act and the implementing regulations generally require United States citizens, residents, and businessmen to file reports of their relationships with foreign financial institutions. The legislative history of the foreign-transaction reporting provisions indicates that the Congress was concerned with the circumvention of United States regulatory, tax, and criminal laws which United States citizens and residents were accomplishing through the medium of secret foreign bank transactions. S. Rep. No. 91–1139, *supra,* at 7; H. R. Rep. No. 91–975, *supra,* at 13.

Section 231 of the Act, 31 U. S. C. § 1101, requires anyone connected with the transaction to report, in the manner prescribed by the Secretary, the transportation into or out of the country of monetary instruments [9] exceeding $5,000 on any one occasion. As

the records required to be maintained by subpart C of this part. Other inspection, review or access to such records is governed by other applicable law."

This regulation became effective January 17, 1973. 37 Fed. Reg. 23114 (1972); 38 Fed. Reg. 2174 (1973).

[9] "Monetary instrument" is defined by § 203 (l) of the Act as "coin and currency of the United States, and in addition, such

provided by the Secretary's regulations, the report must include information as to the amount of the instrument, the date of receipt, the form of instrument, and the person from whom it was received. See 31 CFR §§ 103.23, 103.25.[10] The regulations exempt various classes of persons from this reporting requirement, including banks, brokers or other dealers in securities, common carriers, and others engaged in the business of transporting currency for banks. 31 CFR § 103.23 (c). Monetary instruments which are transported without the filing of a required report, or with a materially erroneous report, are subject to forfeiture under § 232 of the Act, 31 U. S. C. § 1102; a person who has failed to file the required report or who has filed a false report is subject to civil penalties under §§ 207 and 233, 31 U. S. C. §§ 1056 and 1103, as well as criminal penalties under §§ 209 and 210, 31 U. S. C. §§ 1058 and 1059.

Section 241 of the Act, 31 U. S. C. § 1121, authorizes the Secretary to prescribe regulations requiring residents and citizens of the United States, as well as nonresidents in the United States and doing business therein, to maintain records and file reports with respect to their trans-

foreign coin and currencies, and such types of travelers' checks, bearer negotiable instruments, bearer investment securities, bearer securities, and stock with title passing upon delivery, or the equivalent thereof, as the Secretary may by regulation specify for the purposes of the provision of this title to which the regulation relates." 31 U. S. C. § 1052 (l).

[10] The form provided by the Treasury Department for the reporting of these transactions is Form 4790 (Report of International Transportation of Currency or Monetary Instruments). See Motion to Affirm on behalf of the United States in No. 72–985, App. C, pp. 29–30. The report must identify the person required to file the report, his capacity, and the identity of persons for whom he acts, and must specify the amounts and types of monetary instruments, the method of transportation, and, if applicable, the name of the person from whom the shipment was received.

actions and relationships with foreign financial agencies. Pursuant to this authority, the regulations require each person subject to the jurisdiction of the United States to make a report on yearly tax returns of any "financial interest in, or signature or other authority over, a bank, securities or other financial account in a foreign country." 31 CFR § 103.24. Violations of the reporting requirement of § 241 as implemented by the regulations are also subject to civil and criminal penalties under §§ 207, 209, and 210 of the Act, 31 U. S. C. §§ 1056, 1058, and 1059.

### C. Title II—Domestic Financial Transaction Reporting Requirements

In addition to the foreign transaction reporting requirements discussed above, Title II of the Act provides for certain reports of domestic transactions where such reports have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings. Prior to the enactment of the Act, financial institutions had been providing reports of their customers' large currency transactions pursuant to regulations promulgated by the Secretary of Treasury [11] which had required reports of all currency transactions that, in the judgment of the institution, exceeded those "commensurate with the customary conduct of the business, industry or profession of the person or organization concerned." [12] In passing the

---

[11] In issuing these regulations, the Secretary relied upon the authority of two statutory provisions: (1) the Trading with the Enemy Act, 40 Stat. 411, as amended by § 2, Act of Mar. 9, 1933, 48 Stat. 1, and by § 301, First War Powers Act, 1941, 55 Stat. 839, see 12 U. S. C. § 95a (1940 ed., Supp. V); and (2) § 251 of the Revised Statutes, 31 U. S. C. § 427.

[12] The previous regulations promulgated by the Secretary, see 31 CFR § 102.1 (1949), 10 Fed. Reg. 6556, originally mentioned transactions involving $1,000 or more in denominations of $50 or

Act, Congress recognized that the use of financial institutions, both domestic and foreign, in furtherance of activities designed to evade the regulatory mechanisms of the United States, had markedly increased. H. R. Rep. No. 91–975, *supra,* at 10; S. Rep. No. 91–1139, *supra,* at 2–3. Congress recognized the importance of reports of large and unusual currency transactions in ferreting out criminal activity and desired to strengthen the statutory basis for requiring such reports. H. R. Rep. No. 91–975, *supra,* at 11–12. In particular, Congress intended to authorize more definite standards for determining what constitutes the type of unusual transaction that should be reported. S. Rep. No. 91–1139, *supra,* at 6.

Section 221 of the Act, 31 U. S. C. § 1081, therefore delegates to the Secretary the authority for specifying the currency transactions which should be reported, "if they involve the payment, receipt, or transfer of United States currency, or such other monetary instruments as the Secretary may specify." Section 222 of the Act, 31 U. S. C. § 1082, provides that the Secretary may require such reports from the domestic financial institution involved or the parties to the transactions or both.[13] Section 223 of the Act, 31 U. S. C. § 1083, authorizes the Secretary to designate financial institutions to receive such reports.

---

more, or $10,000 or more in any denominations. In 1952, the former amount was raised to $2,500 in denominations of $100 or more. See 17 Fed. Reg. 1822, 2306. When these regulations were revised in 1959 to simplify the reporting form, the Secretary noted the great value of the reports to law enforcement. See Treasury Release No. A–590, Aug. 3, 1959, included in the Jurisdictional Statement for the United States in No. 72–1073, App. E, pp. 127–130.

[13] The proper interpretation of this section is a source of dispute in these appeals. See n. 29, *infra.*

In the implementing regulations promulgated under this authority, the Secretary has required only that financial institutions file certain reports with the Commissioner of Internal Revenue. The regulations require that a report be made for each deposit, withdrawal, exchange of currency,[14] or other payment or transfer "which involves a transaction in currency of more than $10,000." 31 CFR § 103.22.[15] The regulations exempt from the reporting requirement certain intrabank transactions and "transactions with an established customer maintaining a deposit relationship [in amounts] commensurate with the customary conduct of the business, industry, or profession of the customer concerned."

---

[14] "Currency" is defined in the Secretary's regulations as the "coin and currency of the United States or of any other country, which circulate in and are customarily used and accepted as money in the country in which issued. It includes U. S. silver certificates, U. S. notes and Federal Reserve notes, but does not include bank checks or other negotiable instruments not customarily accepted as money." 31 CFR § 103.11.

[15] The form prescribed by the Secretary, see 31 CFR § 103.25 (a), for the reporting of the domestic currency transactions is Treasury Form 4789 (Currency Transaction Report). See Jurisdictional Statement for the United States in No. 72–1073, App. D, p. 121. Form 4789 requires information similar to that required by the previous Treasury reporting form, see n. 12, *supra*, including (1) the name, address, business or profession and social security number of the person conducting the transaction; (2) similar information as to the person or organization for whom it was conducted; (3) a summary description of the nature of the transaction, the type, amount, and denomination of the currency involved and a description of any check involved in the transaction; (4) the type of identification presented; and (5) the identity of the reporting financial institution.

The regulations also provide that the names of all customers whose currency transactions in excess of $10,000 are not reported on Form 4789 must be reported to the Secretary on demand. 31 CFR § 103.22.

40

*Ibid.*[16]   Provision is also made in the regulations whereby information obtained by the Secretary may in some instances and in confidence be available to other departments or agencies of the United States.   31 CFR § 103.43; see 31 U. S. C. § 1061.[17]   There is also provision made in the regulations whereby the Secretary may in his sole discretion make exceptions to or grant exemptions from the requirements of the regulation.   31 CFR § 103.45 (a).[18]   Failure to file the re-

---

[16] Transactions with Federal Reserve Banks or Federal Home Loan Banks, or solely with or originated by financial institutions or foreign banks, are also excluded from these reporting requirements.   31 CFR § 103.22.

[17] Section 212 of the Act, 31 U. S. C. § 1061, authorizes the Secretary to provide by regulation for the availability of information provided in the reports required by the Act to other departments and agencies of the Federal Government.   Pursuant to this authority, the Secretary has promulgated 31 CFR § 103.43, which provides:

"The Secretary may make any information set forth in any report received pursuant to this part available to any other department or agency of the United States upon the request of the head of such department or agency, made in writing and stating the particular information desired, the criminal, tax or regulatory investigation or proceeding in connection with which the information is sought and the official need therefor. Any information made available under this section to other departments or agencies of the United States shall be received by them in confidence, and shall not be disclosed to any person except for official purposes relating to the investigation or proceeding in connection with which the information is sought."

. The last sentence of this regulation was added by an amendment. see 37 Fed. Reg. 23114 (1972); 38 Fed. Reg. 2174 (1973), effective Jan. 17, 1973.

[18] Title 31 CFR § 103.45 (a) provides:

"The Secretary, in his sole discretion, may by written order or authorization make exceptions to or grant exemptions from the requirements of this part. Such exceptions or exemptions may be conditional or unconditional, may apply to particular persons or to classes of persons, and may apply to particular transactions or classes of transactions. They shall, however, be applicable only as

quired report or the filing of a false report subjects the banks to criminal and civil penalties. 31 U. S. C. §§ 1056, 1058, 1059.

## II

This litigation began in June 1972 in the United States District Court for the Northern District of California. Various plaintiffs applied for a temporary restraining order prohibiting the defendants, including the Secretary of the Treasury and heads of other federal agencies, from enforcing the provisions of the Bank Secrecy Act, enacted by Congress on October 26, 1970, and thereafter implemented by the Treasury regulations. The plaintiffs below included several named individual bank customers, the Security National Bank, the California Bankers Association, and the American Civil Liberties Union (ACLU), suing on behalf of itself and its various bank customer members.

The plaintiffs' principal contention in the District Court was that the Act and the regulations were violative of the Fourth Amendment's guarantee against unreasonable search and seizure. The complaints also alleged that the Act violated the First, Fifth, Ninth, Tenth, and Fourteenth Amendments. The District Court issued a temporary restraining order enjoining the enforcement of the foreign and domestic reporting provisions of Title II of the Act, and requested the convening of a three-judge court pursuant to 28 U. S. C. § 2284 to entertain the myriad of constitutional challenges to the Act.

---

expressly stated in the order of authorization, and they shall be revocable in the sole discretion of the Secretary."

When originally promulgated, this regulation additionally gave the Secretary the authority to "impose additional recordkeeping or reporting requirements authorized by statute, or otherwise modify, the requirements of" the Act. 37 Fed. Reg. 6915 (1972). The amendment to the present form became effective January 17, 1973. 37 Fed. Reg. 23114 (1972); 38 Fed. Reg. 2174 (1973).

The three-judge District Court unanimously upheld the constitutionality of the recordkeeping requirements of Title I of the Act and the accompanying regulations, and the requirements of Title II of the Act and the regulations for reports concerning the import and export of currency and monetary instruments and relationships with foreign financial institutions. The District Court concluded, however, with one judge dissenting, that the domestic reporting provisions of §§ 221–223 of Title II of the Act, 31 U. S. C. §§ 1081–1083, were repugnant to the Fourth Amendment of the Constitution. 347 F. Supp. 1242 (1972). The court held that since the domestic reporting provisions of the Act permitted the Secretary of the Treasury to require detailed reports of virtually all domestic financial transactions, including those involving personal checks and drafts, and since the Act could conceivably be administered in such a manner as to compel disclosure of all details of a customer's financial affairs, the domestic reporting provisions must fall as facially violative of the Fourth Amendment. Their enforcement was enjoined.

Both the plaintiffs and the Government defendants filed timely notices of appeal from the portions of the District Court judgment adverse to them. We noted probable jurisdiction over three separate appeals from the decision below pursuant to 28 U. S. C. §§ 1252 and 1253. 414 U. S. 816 (1973):

No. 72–985. The appellant in this appeal is the California Bankers Association, an association of all state and national banks doing business in California. The Association challenges the constitutionality of the record-keeping provisions of Title I, as implemented by the regulations, on two grounds. First, the Association contends that the Act violates the Due Process Clause of the Fifth Amendment because there is no rational rela-

tionship between the objectives of the Act and the recordkeeping required, and because the Act places an unreasonable burden on the Association's member banks. Second, the Association contends that the recordkeeping requirements of Title I violate the First Amendment right of privacy and anonymity of the member banks' customers.

No. 72–1196. This appeal was filed on behalf of a number of plaintiffs in the original suit in the District Court: on behalf of the Security National Bank, on behalf of the American Civil Liberties Union as a depositor in a bank subject to the recordkeeping requirements and as a representative of its bank customer members, and on behalf of certain bank customers. The appeal first challenges the constitutionality of the recordkeeping requirements of Title I of the Act and the implementing regulations, as does the appeal in No. 72–985, *supra.* Second, the appeal challenges the constitutionality of the foreign financial transaction reporting requirements of Title II of the Act and the implementing regulations. These recordkeeping and foreign reporting requirements are challenged on three grounds: first, that the requirements constitute an unreasonable search and seizure in violation of the Fourth Amendment; second, that the requirements constitute a coerced creation and retention of documents in violation of the Fifth Amendment privilege against compulsory self-incrimination; and third, that the requirements violate the First Amendment rights of free speech and free association.

No. 72–1073. In this appeal, the Secretary of the Treasury, as appellant, challenges that portion of the District Court's order holding the domestic financial transaction reporting requirements of Title II to violate the Fourth Amendment. The Government contends that the District Court erred in holding these provisions of Title II to

be unconstitutional on their face, without considering the actual implementation of the statute by the Treasury regulations. The Government urges that since only those who violate these regulations may incur civil or criminal penalties, it is the actual regulations issued by the Secretary of the Treasury, and not the broad authorizing language of the statute, which are to be tested against the standards of the Fourth Amendment; and that when so tested they are valid.

For convenience, we will refer throughout the remainder of this opinion to the District Court plaintiffs as plaintiffs, since they are both appellants and appellees in the appeals filed in this Court.

## III

We entertain serious doubt as to the standing of the plaintiff California Bankers Association to litigate the claims which it asserts here. Its complaint alleged that it is an unincorporated association consisting of 158 state and national banks doing business in California. So far as appears from the complaint, the Association is not in any way engaged in the banking business, and is not even subject to the Secretary's regulations which it challenges. While the District Court found that the Association sued on behalf of its member banks, the Association's complaint contains no such allegation. The Association seeks to litigate, not only claims on behalf of its member banks, but also claims of injury to the depositors of its member banks. Since the Government has not questioned the standing of the Association to litigate the claims peculiar to banks, and more importantly since plaintiff Security National Bank has standing as an affected bank, and therefore determination of the Association's standing would in no way avoid resolution of any constitutional issues, we assume without deciding that

the Association does have standing. See *Doe* v. *Bolton,* 410 U. S. 179, 189 (1973); *Sierra Club* v. *Morton,* 405 U. S. 727, 739 (1972); *NAACP* v. *Button,* 371 U. S. 415, 428 (1963).

We proceed then to consider the initial contention of the bank plaintiffs that the recordkeeping requirements imposed by the Secretary's regulations under the authority of Title I deprive the banks of due process by imposing unreasonable burdens upon them, and by seeking to make the banks the agents of the Government in surveillance of its citizens. Such recordkeeping requirements are scarcely a novelty. The Internal Revenue Code, for example, contains a general authorization to the Secretary of the Treasury to prescribe by regulation records to be kept by both business and individual taxpayers, 26 U. S. C. § 6001, which has been implemented by the Secretary in various regulations.[19] And this Court has been

---

[19] See, *e. g.,* Treas. Reg. § 1.368–3 (records to be kept by taxpayers who participate in tax-free exchanges in connection with a corporate reorganization); § 1.374–3 (records to be kept by a railroad corporation engaging in a tax-free exchange in connection with a railroad reorganization); § 1.857–6 (real estate investment trusts must keep records of stock ownership); § 1.964–3 (shareholders must keep records of their interest in a controlled foreign corporation); § 1.1101–4 (records to be kept by a stock or security holder who receives stock or securities or other property upon a distribution made by a qualified bank holding corporation); § 1.1247–5 (foreign investment company must keep records sufficient to verify what taxable income it may have); § 1.6001–1 (all persons liable to tax under subtitle A of the Internal Revenue Code shall keep records sufficient to establish gross income, deductions, and credits); § 31.6001 *et seq.* (requirements that various employers keep records of withholding under the Railroad Retirement Tax Act and the Federal Unemployment Tax Act); §§ 45.6001–2 to 45.6001–4 (records to be kept by manufacturers of butter and cheese); § 46.6001–2 (records to be kept by manufacturers of sugar); § 46.6001–4 (records to be kept by persons paying premiums on policies issued by foreign insurers). Treas. Reg. § 301.7207–1 provides for criminal penalties

faced with numerous cases involving similar recordkeeping requirements. Similar requirements imposed on the countless businesses subject to the Emergency Price Control Act during the Second World War were upheld in *Shapiro* v. *United States,* 335 U. S. 1 (1948), the Court observing that there was "a sufficient relation between the activity sought to be regulated and the public concern so that the Government can constitutionally regulate or forbid the basic activity concerned, and can constitutionally require the keeping of particular records, subject to inspection . . . ." *Id.,* at 32. In *United States* v. *Darby,* 312 U. S. 100 (1941), the Court held that employers subject to the Fair Labor Standards Act could be required to keep records of wages paid and hours worked:

> "Since, as we have held, Congress may require production for interstate commerce to conform to [wage and hour] conditions, it may require the employer, as a means of enforcing the valid law, to keep a record showing whether he has in fact complied with it." *Id.,* at 125.

We see no reason to reach a different result here. The plenary authority of Congress over both interstate and foreign commerce is not open to dispute, and that body was not limited to any one particular approach to effectuate its concern that negotiable instruments moving in the channels of that commerce were significantly aiding criminal enterprise. The Secretary of the Treasury, authorized by Congress, concluded that copying and retention of certain negotiable instruments by the bank upon which they were drawn would facilitate the detection and apprehension of participants in such criminal

---

for willful delivery or disclosure to the Internal Revenue Service of a document known by the person disclosing it to be false as to any material matter.

enterprises. Congress could have closed the channels of commerce entirely to negotiable instruments, had it thought that so drastic a solution were warranted; it could have made the transmission of the proceeds of any criminal activity by negotiable instruments in interstate or foreign commerce a separate criminal offense. Had it chosen to do the latter, under the precise authority of *Darby* or *Shapiro, supra,* it could have required that each individual engaging in the sending of negotiable instruments through the channels of commerce maintain a record of such action: the bank plaintiffs concede as much.[20]

The bank plaintiffs contend, however, that the Act does not have as its primary purpose regulation of the banks themselves, and therefore the requirement that the banks keep the records is an unreasonable burden on the banks. *Shapiro* and *Darby,* which involved legislation imposing recordkeeping requirements in aid of substantive regulation, are therefore said not to control. But provisions requiring reporting or recordkeeping by the paying institution, rather than the individual who receives the payment, are by no means unique. The Internal Revenue Code and its regulations, for example, contain provisions which require businesses to report income payments to third parties (26 U. S. C. § 6041 (a)), employers to keep records of certain payments made to employees (Treas. Reg. § 31.6001 *et seq.*), corporations to report dividend payments made to third parties (26 U. S. C. § 6042), cooperatives to report patronage dividend payments (26 U. S. C. § 6044), brokers to report customers' gains and losses (26 U. S. C. § 6045), and banks to report payments of interest made to depositors (26 U. S. C. § 6049).

---

[20] Brief for Appellant California Bankers Association in No. 72–985, p. 25.

In *Darby* an identifiable class of employer was made subject to the Fair Labor Standards Act, and in *Shapiro* an identifiable class of business had been placed under the Price Control Act; in each of those instances, Congress found that the purpose of its regulation was adequately secured by requiring records to be kept by the persons subject to the substantive commands of the legislation. In this case, however, Congress determined that recordkeeping alone would suffice for its purposes, and that no correlative substantive legislation was required. Neither this fact, nor the fact that the principal congressional concern is with the activities of the banks' customers, rather than with the activities of the banks themselves, serves to invalidate the legislation on due process grounds.

The bank plaintiffs proceed from the premise that they are complete bystanders with respect to transactions involving drawers and drawees of their negotiable instruments. But such is hardly the case. A voluminous body of law has grown up defining the rights of the drawer, the payee, and the drawee bank with respect to various kinds of negotiable instruments. The recognition of such rights, both in the various States of this country and in other countries, is itself a part of the reason why the banking business has flourished and played so prominent a part in commercial transactions. The bank is a party to any negotiable instrument drawn upon it by a depositor, and upon acceptance or payment of an instrument incurs obligations to the payee. While it obviously is not privy to the background of a transaction in which a negotiable instrument is used, the existing wide acceptance and availability of negotiable instruments is of inestimable benefit to the banking industry as well as to commerce in general.

Banks are therefore not conscripted neutrals in trans-

actions involving negotiable instruments, but parties to the instruments with a substantial stake in their con-. tinued availability and acceptance. Congress not illogically decided that if records of transactions of negotiable instruments were to be kept and maintained, in order to be available as evidence under customary legal process if the occasion warranted, the bank was the most easily identifiable party to the instrument and therefore should do the recordkeeping. We believe this conclusion is consistent with *Darby* and *Shapiro*, and that there is a sufficient connection between the evil Congress sought to address and the recordkeeping procedure it required to pass muster under the Due Process Clause of the Fifth Amendment.[21]

[21] Congress had before it ample testimony that the requirement that banks reproduce checks and maintain other records would significantly aid in the enforcement of federal tax, regulatory, and criminal laws. See House Hearings, *supra*, n. 1, at 151, 322, 359; Senate Hearings, *supra*, n. 1, at 61–68, 175, 230, 250–255, 282. While a substantial portion of the checks drawn on banks in the United States may never be of any utility for law enforcement, tax or regulatory purposes, the regulations do limit the check-copying requirement to checks in excess of $100. 31 CFR §§ 103.34 (b) (3) and (4). This $100 exception was added to the regulations since this litigation was instituted, see n. 5, *supra;* in reviewing the judgment of the District Court in this case, we look to the statute and the regulations as they now stand, not as they once did. *Hall* v. *Beals*, 396 U. S. 45, 48 (1969) *(per curiam)*; *Thorpe* v. *Housing Authority*, 393 U. S. 268, 281 n. 38 (1969).

The California Bankers Association contends that the $100 exception is meaningless since microfilm cameras cannot discriminate between checks in different amounts. There was, however, testimony during the House Hearings that an additional step could be added to the check-handling procedures to sort out those checks not required to be copied, and that many banks have equipment that can sort checks on a dollar-amount basis. House Hearings, *supra,* n. 1, at 322, 359. In any event, it is clear that the Act and regulations do not require banks to microfilm all checks, which some

50

The bank plaintiffs somewhat halfheartedly argue, on the basis of the costs which they estimate will be incurred by the banking industry in complying with the Secretary's recordkeeping requirements, that this cost burden alone deprives them of due process of law. They cite no cases for this proposition, and it does not warrant extended treatment. In its complaint filed in the District Court, plaintiff Security National Bank asserted that it was an "insured" national bank; to the extent that Congress has acted to require records on the part of banks insured by the Federal Deposit Insurance Corporation, or of financial institutions insured under the National Housing Act, Congress is simply imposing a condition on the spending of public funds. See, e. g., *Steward Machine Co.* v. *Davis*, 301 U. S. 548 (1937); *Helvering* v. *Davis*, 301 U. S. 619 (1937). Since there was no allegation in the complaints filed in the District Court, and since it is not contended here that any bank plaintiff is not covered by FDIC or Housing Act insurance, it is unnecessary to consider what questions would arise had Congress relied solely upon its power over interstate commerce to impose the recordkeeping requirements. The cost burdens imposed on the banks by the recordkeeping requirements are far from unreasonable, and we hold that such burdens do not deny the banks due process of law.[22]

---

banks have traditionally done, but instead leave the decision to the banks. Given the fact that the cost burden placed on the banks in implementing the recordkeeping requirements of the statute and regulations is also a reasonable one, see n. 22, *infra*, we do not think that the recordkeeping requirements are unreasonable.

[22] The only figures in the record as to the cost burden placed on the banks by the recordkeeping requirements show that the Bank of America, one of the largest banks in the United States, with 997 branches, $29 billion in deposits, and a net income in excess of $178 million (Moody's Bank and Finance Manual 633–

. The bank plaintiffs also contend that the record-keeping requirements imposed by the Secretary pursuant to the Act undercut a depositor's right to effectively challenge a third-party summons issued by the Internal . Revenue Service. See *Reisman* v. *Caplin,* 375 U. S. 440 (1964); *Donaldson* v. *United States,* 400 U. S. 517 (1971); *Couch* v. *United States,* 409 U. S. 322 (1973). Whatever wrong such a result might work on a depositor, it works no injury on his bank. It is true that in a limited class of cases this Court has permitted a party who suffered injury as a result of the operation of a law to assert his rights even though the sanction of the law was borne by another, *Pierce* v. *Society of Sisters,* 268 U. S. 510 (1925), and conversely, the Court has allowed a party upon whom the sanction falls to rely on the wrong done to a third party in obtaining relief, *Barrows* v. *Jackson,* 346 U. S. 249 (1953); *Eisenstadt* v. *Baird,* 405 U. S. 438 (1972). Whether the bank might in other circumstances rely on an injury to its depositors, or whether, instead, this case is governed by the general rule that one has standing only to vindicate his own rights, e. g., *Moose Lodge* v. *Irvis,* 407 U. S. 163, 166 (1972), need not now be decided, since, in any event, the claim is premature. Claims of depositors against the compul-

---

636 (1972)), expended $392,000 in 1971, including start-up costs, to comply with the microfilming requirements of Title I of the Act. Affidavit of William Ehler, App. 24–25.

The hearings before the House Committee on Banking and Currency indicated that the cost of making microfilm copies of checks ranged from 1½ mills per check for small banks down to about ½ mill or less for large banks. See House Hearings, *supra,* n. 1, at 341, 354–356; H. Rep. No. 91–975, *supra,* at 11. The House Report further indicates that the legislation was not expected to significantly increase the costs of the banks involved since it was found that many banks already followed the practice of maintaining the records contemplated by the legislation.

sion by lawful process of bank records involving the depositors' own transactions must wait until such process issues.

Certain of the plaintiffs below, appellants in No. 72–1196, including the American Civil Liberties Union, the Security National Bank, and various individual plaintiff depositors, argue that if "the dominant purpose of the Bank Secrecy Act is the creation, preservation, and collection of evidence of crime . . . [i]t is against the standards applicable to the criminal law, then, that its constitutionality must be measured." They contend that the recordkeeping requirements violate the provisions of the Fourth, Fifth, and First Amendments to the Constitution. At this point, we deal only with such constitutional challenges as they relate to the recordkeeping provisions of Title I of the Act.

We see nothing in the Act which violates the Fourth Amendment rights of any of these plaintiffs. Neither the provisions of Title I nor the implementing regulations require that any information contained in the records be disclosed to the Government; both the legislative history and the regulations make specific reference to the fact that access to the records is to be controlled by existing legal process.

Plaintiffs urge that when the bank makes and keeps records under the compulsion of the Secretary's regulations it acts as an agent of the Government, and thereby engages in a "seizure" of the records of its customers. But all of the records which the Secretary requires to be kept pertain to transactions to which the bank was itself a party. See *United States* v. *Biswell*, 406 U. S. 311, 316 (1972). The fact that a large number of banks voluntarily kept records of this sort before they were required to do so by regulation is an indication that the records were thought useful to the bank in the conduct of its

own business, as well as in reflecting transactions of its customers. We decided long ago that an Internal Revenue summons directed to a third-party bank was not a violation of the Fourth Amendment rights of either the bank or the person under investigation by the taxing authorities. See *First National Bank* v. *United States,* 267 U. S. 576 (1925), aff'g 295 F. 142 (SD Ala. 1924); *Donaldson* v. *United States, supra,* at 522. "[I]t is difficult to see how the summoning of a third party, and the records of a third party, can violate the rights of the taxpayer, even if a criminal prosecution is contemplated or in progress." *Id.,* at 537 (DOUGLAS, J., concurring).

Plaintiffs nevertheless contend that the broad authorization given by the Act to the Secretary to require the maintenance of records, coupled with the broad authority to require certain reports of financial transactions, amounts to the power to commit an unlawful search of the banks and the customers. This argument is based on the fact that 31 CFR § 103.45, as it existed when the District Court ruled in the case, permitted the Secretary to impose additional recordkeeping or reporting requirements by written order or authorization; this authority has now been deleted from the regulation;[23] plaintiffs thus argue that the Secretary could order the immediate reporting of any records made or kept under the compulsion of the Act. We, of course, must examine the statute and the regulations as they now exist. *Hall* v. *Beals,* 396 U. S. 45, 48 (1969) *(per curiam)*; *Thorpe* v. *Housing Authority,* 393 U. S. 268, 281 n. 38 (1969). Even if plaintiffs were correct in urging that we decide the case on the basis of the regulation as it existed at the time the District Court ruled, their contention would be without merit. Whatever the Secretary *might* have authorized

---

[23] See n. 18. *supra.*

54

under the regulation, he did not in fact require the reporting of any records made or kept under the compulsion of the Act. Indeed, since the legislative history of the Act clearly indicates that records which it authorized the Secretary to require were to be available only by normal legal process, it is doubtful that the Secretary would have the authority ascribed to him by plaintiffs even under the earlier form of the regulation. But in any event, whether or not he had the authority, he did not exercise it, and in fact none of the records were required to be reported. Since we hold that the mere maintenance of the records by the banks under the compulsion of the regulations invaded no Fourth Amendment right of any depositor, plaintiffs' attack on the record-keeping requirements under that Amendment fails.[24] That the bank in making the records required by the Secretary acts under the compulsion of the regulation is clear, but it is equally clear that in doing so it neither searches nor seizes records in which the depositor has a Fourth Amendment right.

[24] Chapter 4 of the Act, § 241, 31 U. S. C. § 1121, authorizes the Secretary to require by regulation the maintenance of records by persons who engage in any transaction or maintain a relationship, directly or indirectly, on behalf of themselves or others, with a foreign financial agency. The Secretary has, by regulation, required the maintenance of such records by persons having such financial interests and by domestic financial institutions which engage in monetary transactions outside the United States. 31 CFR §§ 103.32, 103.33. The Act also provides that production of such records shall be compelled only by "a subpena or summons duly authorized and issued or as may otherwise be required by law." 31 U. S. C. § 1121 (b). Though it is not apparent from the various briefs filed in this Court by the plaintiffs below whether this particular record-keeping requirement is challenged, our holding that a mere requirement that records be kept does not violate any constitutional right of the banks or of the depositors necessarily disposes of such a claim, since there is no indication at this point that there has been any attempt to compel the production of such records.

Plaintiffs have briefed their contentions in such a way that we cannot be entirely certain whether their Fifth Amendment attack is directed only to the reporting provisions of the regulations, or to the recordkeeping provisions as well. To the extent that it is directed to the regulations requiring the banks to keep records, it is without merit. Incorporated banks, like other organizations, have no privilege against compulsory self-incrimination, e. g., *Hale* v. *Henkel,* 201 U. S. 43, 74–75 (1906); *Wilson* v. *United States,* 221 U. S. 361, 382–384 (1911); *United States* v. *White,* 322 U. S. 694, 699 (1944). Since a party incriminated by evidence produced by a third party sustains no violation of his own Fifth Amendment rights, *Johnson* v. *United States,* 228 U. S. 457, 458 (1913); *Couch* v. *United States,* 409 U. S., at 328, the depositor plaintiffs here present no meritorious Fifth Amendment challenge to the recordkeeping requirements.

Plaintiff ACLU makes an additional challenge to the recordkeeping requirements of Title I. It argues that those provisions, and the implementing regulations, violate its members' First Amendment rights, since the provisions could possibly be used to obtain the identities of its members and contributors through the examination of the organization's bank records. This Court has recognized that an organization may have standing to assert that constitutional rights of its members be protected from governmentally compelled disclosure of their membership in the organization, and that absent a countervailing governmental interest, such information may not be compelled. *NAACP* v. *Alabama,* 357 U. S. 449 (1958). See *Pollard* v. *Roberts,* 283 F. Supp. 248 (ED Ark.), aff'd *per curiam,* 393 U. S. 14 (1968).

Those cases, however, do not elicit a *per se* rule that would forbid such disclosure in a situation where the governmental interest would override the associational

interest in maintaining such confidentiality. Each of them was litigated after a subpoena or summons had already been served for the records of the organization, and an action brought by the organization to prevent the actual disclosure of the records.[25] No such disclosure has been sought by the Government here, and the ACLU's challenge is therefore premature. This Court, in the absence of a concrete fact situation in which competing associational and governmental interests can be weighed, is simply not in a position to determine whether an effort to compel disclosure of such records would or would not be barred by cases such as *NAACP* v. *Alabama, supra.*[26] The threat to any First Amendment rights of the ACLU or its members from the mere existence of the records in the hands of the bank is a good deal more

---

[25] The ACLU recognizes that these cases, and the other cases it cites involved situations in which a subpoena or summons had already issued. Brief for Appellant ACLU in No. 72–1196, p. 57. See *Lamont* v. *Postmaster General,* 381 U. S. 301 (1965); *Gibson* v. *Florida Legislative Investigation Comm.,* 372 U. S. 539 (1963); *Louisiana ex rel. Gremillion* v. *NAACP,* 366 U. S. 293 (1961); *Shelton* v. *Tucker,* 364 U. S. 479 (1960); *Bates* v. *Little Rock,* 361 U. S. 516 (1960); *NAACP* v. *Alabama,* 357 U: S. 449 (1958); *United States* v. *Rumely,* 345 U. S. 41 (1953).

[26] The ACLU contends that present injunctive relief is essential, since the banks might not notify it of the fact that their records have been subpoenaed, and might comply with the subpoena without giving the ACLU a chance to obtain judicial review. While noting that "most banks formally prohibit" it (citing American Banker, May 12, 1972, p. 1, cols. 3–4), the ACLU also contends that the "day-to-day practice of permitting 'informal' access to bank records is, unfortunately, widespread." Brief for Appellant ACLU in No. 72–1196, p. 58.

The record contains no showing of any attempt by the Government, formal or informal, to compel the production of bank records containing information relating to the ACLU; we accordingly express no opinion whether notice would in such an instance be required by either the Act or the Constitution.

remote than the threat assertedly posed by the Army's system of compilation and distribution of information which we declined to adjudicate in *Laird* v. *Tatum*, 408 U. S. 1 (1972).

IV

We proceed now to address the constitutional challenges directed at the reporting requirements of the regulations authorized in Title II of the Act. Title II authorizes the Secretary to require reporting of two general categories of banking transactions: foreign and domestic. The District Court upheld the constitutionality of the foreign transaction reporting requirements of regulations issued under Title II; certain of the plaintiffs below, appellants in No. 72–1196, have appealed from that portion of the District Court's judgment, and here renew their contentions of constitutional infirmity in the foreign reporting regulations based upon the First, Fourth, and Fifth Amendments. The District Court invalidated the Act insofar as it authorized the Secretary to promulgate regulations requiring banks to report domestic transactions involving their customers, and the Government in No. 72–1073 appeals from that portion of the District Court's judgment.

As noted above, the regulations issued by the Secretary under the authority of Title II contain two essential reporting requirements with respect to foreign financial transactions. Chapter 3 of Title II of the Act, 31 U. S. C. §§ 1101–1105, and the corresponding regulation, 31 CFR § 103.23, require individuals to report transportation of monetary instruments into or out of the United States, or receipts of such instruments in the United States from places outside the United States, if the instrument transported or received has a value in excess of $5,000. Chapter 4 of Title II of the Act, 31 U. S. C. §§ 1121–1122, and the corresponding regulation, 31 CFR § 103.24, gen-

erally require United States citizens, residents, and businessmen to file reports of their relationships with foreign financial institutions.

The domestic reporting provisions of the Act as implemented by the regulations, in contrast to the foreign reporting requirements, apply only to banks and financial institutions. In enacting the statute, Congress provided in § 221, 31 U. S. C. § 1081, that the Secretary might specify the types of currency transactions which should be reported:

> "Transactions involving any domestic financial institution shall be reported to the Secretary at such time, in such manner, and in such detail as the Secretary may require if they involve the payment, receipt, or transfer of United States currency, or such other monetary instruments as the Secretary may specify, in such amounts, denominations, or both, or under such circumstances, as the Secretary shall by regulation prescribe."

Section 222 of the Act, 31 U. S. C. § 1082, authorizes the Secretary to require such reports from the domestic financial institution involved, from the parties to the transactions, or from both. In exercising his authority under these sections, the Secretary has promulgated regulations which require only that the financial institutions make the report to the Internal Revenue Service; he has not required any report from the individual parties to domestic financial transactions.[27] The applicable regulation, 31 CFR § 103.22, requires the financial institution to "file a report of each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institution, which involves a transaction in currency of more than $10,000." The regulation exempts several types of currency transactions

---

[27] See n. 29, infra.

from this reporting requirement, including transactions "with an established customer maintaining a deposit relationship with the bank, in amounts which the bank may reasonably conclude do not exceed amounts commensurate with the customary conduct of the business, industry or profession of the customer concerned." *Ibid.*

## A. FOURTH AMENDMENT CHALLENGE TO THE FOREIGN REPORTING REQUIREMENTS

The District Court, in differentiating for constitutional purposes between the foreign reporting requirements and the domestic reporting requirements imposed by the Secretary, relied upon our opinion in *United States* v. *U. S. District Court*, 407 U. S. 297 (1972), for the proposition that Government surveillance in the area of foreign relations is in some instances subject to less constitutional restraint than would be similar activity in domestic affairs. Our analysis does not take us over this ground.

The plenary authority of Congress to regulate foreign commerce, and to delegate significant portions of this power to the Executive, is well established. *C. & S. Air Lines* v. *Waterman Corp.*, 333 U. S. 103, 109 (1948); *Norwegian Nitrogen Products Co.* v. *United States*, 288 U. S. 294 (1933). Plaintiffs contend that in exercising that authority to require reporting of previously described foreign financial transactions, Congress and the Secretary have abridged their Fourth Amendment rights.

The familiar language of the Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." Since a statute requiring the filing and subsequent publication of a corporate tax return has been upheld against a Fourth Amendment challenge, *Flint* v. *Stone Tracy Co.*, 220 U. S. 107, 174–176 (1911), reporting requirements are by no means

*per se* violations of the Fourth Amendment. Indeed, a contrary holding might well fly in the face of the settled sixty-year history of self-assessment of individual and corporate income taxes in the United States. This Court has on numerous occasions recognized the importance of the self-regulatory aspects of that system, and interests of the Congress in enforcing it:

> "In assessing income taxes the Government relies primarily upon the disclosure by the taxpayer of the relevant facts. This disclosure it requires him to make in his annual return. To ensure full and honest disclosure, to discourage fraudulent attempts to evade the tax, Congress imposes sanctions. Such sanctions may confessedly be either criminal or civil." *Helvering* v. *Mitchell,* 303 U. S. 391, 399 (1938).

To the extent that the reporting requirements of the Act and the settled practices of the tax collection process are similar, this history must be overcome by those who argue that the reporting requirements are a violation of the Fourth Amendment. Plaintiffs contend, however, that *Boyd* v. *United States,* 116 U. S. 616 (1886), establishes the invalidity of the foreign reporting requirement under the Fourth Amendment, and that the particular requirements imposed are so indiscriminate in their nature that the regulations must be deemed to be the equivalent of a general warrant of the kind condemned as obnoxious to the Fourth Amendment in cases such as *Stanford* v. *Texas,* 379 U. S. 476 (1965). We do not think these cases would support plaintiffs even if their contentions were directed at the domestic reporting requirements; in light of the fact that the foreign reporting requirements deal with matters in foreign commerce, we think plaintiffs' reliance on the cases to challenge those requirements must fail.

*Boyd* v. *United States, supra,* is a case which has been the subject of repeated citation, discussion, and explanation since the time of its decision 88 years ago. In *Communist Party* v. *SACB,* 367 U. S. 1 (1961), the Court described the *Boyd* holding as follows:

> "The *Boyd* case involved a statute providing that in proceedings other than criminal arising under the revenue laws, the Government could secure an order of the court requiring the production by an opposing claimant or defendant of any documents under his control which, the Government asserted, might tend to prove any of the Government's allegations. If production were not made, the allegations were to be taken as confessed. On the Government's motion, the District Court had entered such an order, requiring the claimants in a forfeiture proceeding to produce a specified invoice. Although the claimants objected that the order was improper and the statute unconstitutional in coercing self-incriminatory disclosures and permitting unreasonable searches and seizures, they did, under protest, produce the invoice, which was, again over their constitutional objection, admitted into evidence. This Court held that on such a record a judgment for the United States could not stand, and that the statute was invalid as repugnant to the Fourth and Fifth Amendments." *Id.,* at 110.

But the *Boyd* Court recognized that the Fourth Amendment does not prohibit all requirements that information be made available to the Government:

> "[T]he supervision authorized to be exercised by officers of the revenue over the manufacture or custody of excisable articles, and the entries thereof in books required by law to be kept for their inspection, are necessarily excepted out of the category of

62

unreasonable searches and seizures.'' 116 U. S., at 623–624.

*Stanford* v. *Texas, supra,* involved a warrant issued by a state judge which described petitioner's home and authorized the search and seizure of "books, records, pamphlets, cards, receipts, lists, memoranda, pictures, recordings and other written instruments concerning the Communist Party of Texas." This Court found the warrant to be an unconstitutional general warrant, and invalidated the search and seizure conducted pursuant to it. Unlike the situation in *Stanford,* the Secretary's regulations do not authorize indiscriminate rummaging among the records of the plaintiffs, nor do the reports they require deal with literary material as in *Stanford;* the information sought is about commerce, not literature. The reports of foreign financial transactions required by the regulations must contain information as to a relatively limited group of financial transactions in foreign commerce, and are reasonably related to the statutory purpose of assisting in the enforcement of the laws of the United States.

Of primary importance, in addition, is the fact that the information required by the foreign reporting requirements pertains only to commercial transactions which take place across national boundaries. Mr. Chief Justice Taft, in his opinion for the Court in *Carroll* v. *United States,* 267 U. S. 132 (1925), observed:

"Travellers may be so stopped in crossing an international boundary because of national self protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in." *Id.,* at 154.

This settled proposition has been reaffirmed as recently

as last Term in *Almeida-Sanchez* v. *United States,* 413 U. S. 266, 272 (1973). If reporting of income may be required as an aid to enforcement of the federal revenue statutes, and if those entering and leaving the country may be examined as to their belongings and effects, all without violating the Fourth Amendment, we see no reason to invalidate the Secretary's regulations here. The statutory authorization for the regulations was based upon a conclusion by Congress that international currency transactions and foreign financial institutions were being used by residents of the United States to circumvent the enforcement of the laws of the United States. The regulations are sufficiently tailored so as to single out transactions found to have the greatest potential for such circumvention and which involve substantial amounts of money. They are therefore reasonable in the light of that statutory purpose, and consistent with the Fourth Amendment.

## B. FOURTH AMENDMENT CHALLENGE TO THE DOMESTIC REPORTING REQUIREMENTS

The District Court examined the domestic reporting requirements imposed on plaintiffs by looking to the broad authorization of the Act itself, without specific reference to the regulations promulgated under its authority. The District Court observed:

> "[A]lthough to date the Secretary has required reporting only by the financial institutions and then only of *currency* transactions over $10,000, he is empowered by the Act, as indicated above, to require, if he so decides, reporting not only by the financial institution, but also by other parties to or participants in transactions with the institutions and, further, that the Secretary may require reports, not only of currency transactions but of any transaction

involving any monetary instrument—and in any amount—large or small." 347 F. Supp., at 1246.

The District Court went on to pose, as the question to be resolved, whether "these provisions, broadly authorizing an executive agency of government to require financial institutions and parties [thereto] . . . to routinely report . . . the detail of almost every conceivable financial transaction . . . [are] such an invasion of a citizen's right of privacy as amounts to an unreasonable search within the meaning of the Fourth Amendment." *Ibid.*

Since, as we have observed earlier in this opinion, the statute is not self-executing, and were the Secretary to take no action whatever under his authority there would be no possibility of criminal or civil sanctions being imposed on anyone, the District Court was wrong in framing the question in this manner. The question is not what sort of reporting requirements *might* have been imposed by the Secretary under the broad authority given him in the Act, but rather what sort of reporting requirements he did *in fact* impose under that authority.

> "Even where some of the provisions of a comprehensive legislative enactment are ripe for adjudication, portions of the enactment not immediately involved are not thereby thrown open for a judicial determination of constitutionality. 'Passing upon the possible significance of the manifold provisions of a broad statute in advance of efforts to apply the separate provisions is analogous to rendering an advisory opinion upon a statute or a declaratory judgment upon a hypothetical case.' *Watson* v. *Buck*, 313 U. S. 387, 402." *Communist Party* v. *SACB*, 367 U. S., at 71.

The question for decision, therefore, is whether the regulations relating to the reporting of domestic trans-

actions, violations of which could subject those required to report to civil or criminal penalties, invade any Fourth Amendment right of those required to report. To that question we now turn.

The regulations issued by the Secretary require the reporting of domestic financial transactions only by financial institutions. *United States* v. *Morton Salt Co.,* 338 U. S. 632 (1950), held that organizations engaged in commerce could be required by the Government to file reports dealing with particular phases of their activities. The language used by the Court in that case is instructive:

> "It is unnecessary here to examine the question of whether a corporation is entitled to the protection of the Fourth Amendment. *Cf. Oklahoma Press Publishing Co.* v. *Walling,* 327 U. S. 186. Although the 'right to be let alone—the most comprehensive of rights and the right most valued by civilized men,' Brandeis, J., dissenting in *Olmstead* v. *United States,* 277 U. S. 438, 471, at 478, is not confined literally to searches and seizures as such, but extends as well to the orderly taking under compulsion of process, *Boyd* v. *United States,* 116 U. S. 616, *Hale* v. *Henkel,* 201 U. S. 43, 70, neither incorporated nor unincorporated associations can plead an unqualified right to conduct their affairs in secret. *Hale* v. *Henkel, supra; United States* v. *White,* 322 U. S. 694.
>
> "While they may and should have protection from unlawful demands made in the name of public investigation, *cf. Federal Trade Comm'n* v. *American Tobacco Co.,* 264 U. S. 298, corporations can claim no equality with individuals in the enjoyment of a right to privacy. *Cf. United States* v. *White, supra.* They are endowed with public attributes. They have a collective impact upon society, from

which they derive the privilege of acting as artificial entities. The Federal Government allows them the privilege of engaging in interstate commerce. Favors from government often carry with them an enhanced measure of regulation. [Citations omitted.] Even if one were to regard the request for information in this case as caused by nothing more than official curiosity, nevertheless law-enforcing agencies have a legitimate right to satisfy themselves that corporate behavior is consistent with the law and the public interest." 338 U. S., at 651–652.

We have no difficulty then in determining that the Secretary's requirements for the reporting of domestic financial transactions abridge no Fourth Amendment right of the banks themselves. The bank is not a mere stranger or bystander with respect to the transactions which it is required to record or report. The bank is itself a party to each of these transactions, earns portions of its income from conducting such transactions, and in the past may have kept records of similar transactions on a voluntary basis for its own purposes. See *United States* v. *Biswell*, 406 U. S., at 316. The regulations presently in effect governing the reporting of domestic currency transactions require information as to the personal and business identity of the person conducting the transaction and of the person or organization for whom it was conducted, as well as a summary description of the nature of the transaction. It is conceivable, and perhaps likely, that the bank might not of its own volition compile this amount of detail for its own purposes, and therefore to that extent the regulations put the bank in the position of seeking information from the customer in order to eventually report it to the Government. But as we have noted above, "neither

incorporated nor unincorporated associations can plead an unqualified right to conduct their affairs in secret." *United States* v. *Morton Salt Co., supra,* at 652.

The regulations do not impose unreasonable reporting requirements on the banks. The regulations require the reporting of information with respect to abnormally large transactions in currency, much of which information the bank as a party to the transaction already possesses or would acquire in its own interest. To the extent that the regulations in connection with such transactions require the bank to obtain information from a customer simply because the Government wants it, the information is sufficiently described and limited in nature, and sufficiently related to a tenable congressional determination as to improper use of transactions of that type in interstate commerce, so as to withstand the Fourth Amendment challenge made by the bank plaintiffs. "[T]he inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant. The gist of the protection is in the requirement, expressed in terms, that the disclosure sought shall not be unreasonable.'" *United States* v. *Morton Salt Co., supra,* at 652–653; see *Oklahoma Press Publishing Co.* v. *Walling,* 327 U. S. 186, 208 (1946).

In addition to the Fourth Amendment challenge to the domestic reporting requirements made by the bank plaintiffs, we are faced with a similar challenge by the depositor plaintiffs, who contend that since the reports of domestic transactions which the bank is required to make will include transactions to which the depositors were parties, the requirement that the bank make a report of the transaction violates the Fourth Amendment rights of the depositor. The complaint filed in the District Court by the ACLU and the depositors contains

no allegation by any of the individual depositors that they were engaged in the type of $10,000 domestic currency transaction which would necessitate that their bank report it to the Government. This is not a situation where there might have been a mere oversight in the specificity of the pleadings and where this Court could properly infer that participation in such a transaction was necessarily inferred from the fact that the individual plaintiffs allege that they are in fact "depositors." Such an inference can be made, for example, as to the recordkeeping provisions of Title I, which require the banks to keep various records of certain transactions by check; as our discussion of the challenges by the individual depositors to the recordkeeping provisions, *supra*, implicitly recognizes, the allegation that one is a depositor is sufficient to permit consideration of the challenges to the recordkeeping provisions, since any depositor would to some degree be affected by them. Here, however, we simply cannot assume that the mere fact that one is a depositor in a bank means that he has engaged or will engage in a transaction involving more than $10,000 in currency, which is the only type of domestic transaction which the Secretary's regulations require that the banks report. That being so, the depositor plaintiffs lack standing to challenge the domestic reporting regulations, since they do not show that their transactions are required to be reported.[28]

"Plaintiffs in the federal courts 'must allege some threatened or actual injury resulting from the puta-

[28] We hold here and in other parts of this opinion that certain of the plaintiffs did not make the requisite allegations in the District Court to give them standing to challenge the Act and the regulations issued pursuant to it. In so holding, we do not, of course, mean to imply that such claims would be meritorious if presented by a litigant who has standing.

tively illegal action before a federal court may assume jurisdiction.' *Linda R. S. v. Richard D.*, 410 U. S. 614, 617 (1973). There must be a 'personal stake in the outcome' such as to 'assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.' *Baker* v. *Carr*, 369 U. S. 186, 204 (1962). . . . Abstract injury is not enough. It must be alleged that the plaintiff 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged statute or official conduct. *Massachusetts* v. *Mellon*, 262 U. S. 447, 488 (1923). The injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.' *Golden* v. *Zwickler*, 394 U. S. 103, 109–110 (1969); *Maryland Casualty Co.* v. *Pacific Coal & Oil Co.*, 312 U. S. 270, 273 (1941); *United Public Workers* v. *Mitchell*, 330 U. S. 75, 89–91 (1947)." *O'Shea* v. *Littleton*, 414 U. S. 488, 493–494 (1974) (footnote omitted).

We therefore hold that the Fourth Amendment claims of the depositor plaintiffs may not be considered on the record before us. Nor do we think that the California Bankers Association or the Security National Bank can vicariously assert such Fourth Amendment claims on behalf of bank customers in general.

The regulations promulgated by the Secretary require that a report concerning a domestic currency transaction involving more than $10,000 be filed only by the financial institution which is a party to the transaction; the regulations do not require a report from the customer. 31 CFR § 103.22; see 31 U. S. C. § 1082. Both the bank and depositor plaintiffs here argue that the regulations are constitutionally defective because they do not require

the financial institution to notify the customer that a report will be filed concerning the domestic currency transaction. Since we have held that the depositor plaintiffs have not made a sufficient showing of injury to make a constitutional challenge to the domestic reporting requirements, we do not address ourselves to the necessity of notice to those bank customers whose transactions must be reported. The fact that the regulations do not require the banks to notify the customer of the report violates no constitutional right of the banks, and the banks in any event are left free to adopt whatever customer notification procedures they desire.[29]

[29] Plaintiffs similarly contend that the Secretary's regulation requiring the reporting of domestic currency transactions *only* by the banks or financial institutions which are parties thereto, violates a specific requirement of the Act. Section 222 of the Act, 31 U. S. C. § 1082, provides in pertinent part:

"The report of any transaction required to be reported under this chapter shall be signed or otherwise made both by the domestic financial institution involved and by one or more of the other parties thereto or participants therein, as the Secretary may require."

Plaintiffs contend that this language *requires* the Secretary to require either a signature on the report by the individual customer in the currency transaction, or a report from that customer. Since the Secretary has only required a report from the financial institution, plaintiffs urge, in addition, that there will not be notice to the individual customer of the report made by the financial institution.

In rebuttal, the Government urged in oral argument, Tr. of Oral Arg. 64–70, that not only does § 206 of the Act, 31 U S. C. § 1055, give the Secretary broad authority to make exceptions to the requirements of the Act in promulgating the regulations, but that the House and Senate Reports on the bills considered by each house of the Congress, each of which contained a provision identical to the language of § 222, indicated that each chamber read that language differently. The Senate Committee believed that the language permitted the Secretary to require reports from the financial institution, the customer, *or* both, S. Rep. No. 91–1139, *supra*, at 15, while the House Committee felt that the language required

## C. Fifth Amendment Challenge to the Foreign and Domestic Reporting Requirements

The District Court rejected the depositor plaintiffs' claim that the foreign reporting requirements violated the depositors' Fifth Amendment privilege against compulsory self-incrimination, and found it unnecessary to consider the similarly based challenge to the domestic reporting requirements since the latter were found to be in violation of the Fourth Amendment. The appeal of the depositor plaintiffs in No. 72–1196 challenges the foreign reporting requirements under the Fifth Amendment, and their brief likewise challenges the domestic reporting requirements as violative of that Amendment. Since they are free to urge in this Court reasons for affirming the judgment of the District Court which may not have been relied upon by the District Court, we consider here the Fifth Amendment objections to both the foreign and the domestic reporting requirements.

As we noted above, the bank plaintiffs, being corporations, have no constitutional privilege against compulsory self-incrimination by virtue of the Fifth Amendment. *Hale* v. *Henkel,* 201 U. S. 43 (1906). Their brief urges that they may vicariously assert Fifth Amendment claims on behalf of their depositors. But since we hold *infra* that those depositor plaintiffs who are actually parties in this litigation are premature in asserting any Fifth Amendment claims, we do not believe that the banks

---

reports to be filed by both the financial institution and the customer, H. R. Rep. No. 91–975, *supra,* at 22.

We similarly do not reach this claim as it relates to the depositor plaintiffs since they failed to allege sufficient injury below. Whatever the merits of such a contention *vis-à-vis* the depositors, the regulation clearly has no adverse effect on any constitutional right of the banks, since the statute indisputably authorizes the Secretary to require a report from the bank.

under these circumstances have standing to assert Fifth Amendment claims on behalf of customers in general.

The individual depositor plaintiffs below made various allegations in the complaint and affidavits filed in the District Court. Plaintiff Stark alleged that he was, in addition to being president of plaintiff Security National Bank, a customer of and depositor in the bank. Plaintiff Marson alleged that he was a customer of and depositor in the Bank of America. Plaintiff Lieberman alleged that he had repeatedly in the recent past transported or shipped one or more monetary instruments exceeding $5,000 in value from the United States to places outside the United States, and expected to do likewise in the near future. Plaintiffs Lieberman, Harwood, Bruer, and Durell each alleged that they maintained a financial interest in and signature authority over one or more bank accounts in foreign countries. This, so far as we can ascertain from the record, is the sum and substance of the depositors' allegations of fact upon which they seek to mount an attack on the reporting requirements of regulations as violative of the privilege against compulsory self-incrimination granted to each of them by the Fifth Amendment.

Considering first the challenge of the depositor plaintiffs to the foreign reporting requirements, we hold that such claims are premature. In *United States* v. *Sullivan,* 274 U. S. 259 (1927), this Court reviewed a judgment of the Court of Appeals for the Fourth Circuit, 15 F. 2d 809 (1926), which had held that the Fifth Amendment protected the respondent from being punished for failure to file an income tax return. This Court reversed the decision below, stating:

"As the defendant's income was taxed, the statute of course required a return. See *United States* v. *Sischo,* 262 U. S. 165. In the decision that this was contrary to the Constitution we are of opinion that

the protection of the Fifth Amendment was pressed too far. If the form of return provided called for answers that the defendant was privileged from making he could have raised the objection in the return, but could not on that account refuse to make any return at all. We are not called on to decide what, if anything, he might have withheld. Most of the items warranted no complaint. It would be an extreme if not an extravagant application of the Fifth Amendment to say that it authorized a man to refuse to state the amount of his income because it had been made in crime. But if the defendant desired to test that or any other point he should have tested it in the return so that it could be passed upon. He could not draw a conjurer's circle around the whole matter by his own declaration that to write any word upon the government blank would bring him into danger of the law." 274 U. S., at 263-264.

Here the depositor plaintiffs allege that they intend to engage in foreign currency transactions or dealings with foreign banks which the Secretary's regulations will require them to report, but they make no additional allegation that any of the information required by the Secretary will tend to incriminate them. It will be time enough for us to determine what, if any, relief from the reporting requirement they may obtain in a judicial proceeding when they have properly and specifically raised a claim of privilege with respect to particular items of information required by the Secretary, and the Secretary has overruled their claim of privilege. The posture of plaintiffs' Fifth Amendment rights here is strikingly similar to those asserted in *Communist Party* v. *SACB*, 367 U. S., at 105-110. The Communist Party there sought to assert the Fifth Amendment claims of its officers as a

defense to the registration requirement of the Subversive Activities Control Act, although the officers were not at that stage of the proceeding required by the Act to register, and had neither registered nor refused to register on the ground that registration might incriminate them. The Court said:

> "If a claim of privilege is made, it may or may not be honored by the Attorney General. We cannot, on the basis of supposition that privilege will be claimed and not honored, proceed now to adjudicate the constitutionality under the Fifth Amendment of the registration provisions. Whatever proceeding may be taken after and if the privilege is claimed will provide an adequate forum for litigation of that issue." *Id.,* at 107.

Plaintiffs argue that cases such as *Albertson* v. *SACB,* 382 U. S. 70 (1965), have relaxed the requirements of earlier cases, but we do not find that contention supported by the language or holding of that case. There the Attorney General had petitioned for and obtained an order from the Subversive Activities Control Board compelling certain named members of the Communist Party to register their affiliation. In response to the Attorney General's petitions, both before the Board and in subsequent judicial proceedings, the Communist Party members had asserted the privilege against self-incrimination, and their claims had been rejected by the Attorney General. A previous decision of this Court had held that an affirmative answer to the inquiry as to membership in the Communist Party was an incriminating admission protected under the Fifth Amendment. *Blau* v. *United States,* 340 U. S. 159 (1950). The differences then between the posture of the depositor plaintiffs in this case and that of petitioner in *Albertson* v. *SACB supra,* are evident.

We similarly think that the depositor plaintiffs' challenges to the domestic reporting requirements are premature. As we noted above, it is not apparent from the allegations of the complaints in these actions that any of the depositor plaintiffs would be engaged in $10,000 domestic transactions with the bank which the latter would be required to report under the Secretary's regulations pertaining to such domestic transactions. Not only is there no allegation that any depositor engaged in such transactions, but there is no allegation in the complaint that any report which such a bank was required to make would contain information incriminating any depositor. To what extent, if any, depositors may claim a privilege arising from the Fifth Amendment by reason of the obligation of the bank to report such a transaction may be left for resolution when the claim of privilege is properly asserted.

Depositor plaintiffs rely on *Marchetti* v. *United States,* 390 U. S. 39 (1968), *Grosso* v. *United States,* 390 U. S. 62 (1968), and *Haynes* v. *United States,* 390 U. S. 85 (1968), as supporting the merits of their Fifth Amendment claim. In each of those cases, however, a claim of privilege was asserted as a defense to the requirement of reporting particular information required by the law under challenge, and those decisions therefore in no way militate against our conclusion that depositor plaintiffs' efforts to litigate the Fifth Amendment issue at this time are premature.

D. PLAINTIFF ACLU's FIRST AMENDMENT CHALLENGE
TO THE FOREIGN AND DOMESTIC REPORTING
REQUIREMENTS

The ACLU claims that the reporting requirements with respect to foreign and domestic transactions invade its associational interests protected by the First Amend-

ment.  We have earlier held a similar claim by this organization to be speculative and hypothetical when addressed to the recordkeeping requirements imposed by the Secretary.  *Supra*, at 55–57.  The requirement that particular transactions be reported to the Government, rather than that records of them be available through normal legal process, removes part of the speculative quality of the claim.  But the only allegation found in the complaints with respect to the financial activities of the ACLU states that it maintains accounts at one of the San Francisco offices of the Wells Fargo Bank & Trust Company.  There is no allegation that the ACLU engages with any regularity in abnormally large domestic currency transactions, transports or receives monetary instruments from channels of foreign commerce, or maintains accounts in financial institutions in foreign countries.  Until there is some showing that the reporting requirements contained in the Secretary's regulations would require the reporting of information with respect to the organization's financial activities, no concrete controversy is presented to this Court for adjudication.  *O'Shea* v. *Littleton*, 414 U. S., at 493–494.

## V

All of the bank and depositor plaintiffs have stressed in their presentations to the District Court and to this Court that the recordkeeping and reporting requirements of the Bank Secrecy Act are focused in large part on the acquisition of information to assist in the enforcement of the criminal laws.  While, as we have noted, Congress seems to have been equally concerned with civil liability which might go undetected by reason of transactions of the type required to be recorded or reported, concern for the enforcement of the criminal law was undoubtedly prominent in the minds of the legislators who considered

the Act. We do not think it is strange or irrational that Congress, having its attention called to what appeared to be serious and organized efforts to avoid detection of criminal activity, should have legislated to rectify the situation. We have no doubt that Congress, in the sphere of its legislative authority, may just as properly address itself to the effective enforcement of criminal laws which it has previously enacted as to the enactment of those laws in the first instance. In so doing, it is of course subject to the strictures of the Bill of Rights, and may not transgress those strictures.[30] But the fact that a legislative enactment manifests a concern for the enforcement of the criminal law does not cast any generalized pall of constitutional suspicion over it. Having concluded that on the record in these appeals, plaintiffs have failed to state a claim for relief under the First, Fourth, and Fifth Amendments, and having concluded that the enactment in question was within the legislative authority of Congress, our inquiry is at an end.

On the appeal of the California Bankers Association in No. 72–985 from that portion of the judgment of the District Court upholding the recordkeeping requirements imposed by the Secretary pursuant to Title I, the judgment is affirmed. On the appeal of the bank and depositor plaintiffs in No. 72–1196 from that portion of the District Court's judgment upholding the recordkeeping requirements and regulations of Title I and the foreign reporting requirements imposed under the authority of Title II, the judgment is likewise affirmed. On the Gov-

---

[30] There have been recent hearings in Congress on various legislative proposals to amend the Bank Secrecy Act. Hearings to amend the Bank Secrecy Act (S. 3814 and S. 3828) before the Subcommittee on Financial Institutions of the Senate Committee on Banking, Housing and Urban Affairs, 92d Cong., 2d Sess. (1972). See S. 3814 and S. 3828, 92d Cong., 2d Sess. (1972).

ernment's appeal in No. 72–1073 from that portion of the District Court's judgment which held that the domestic reporting requirements imposed under Title II of the Act violated the Constitution, the judgment is reversed. The cause is remanded to the District Court for disposition consistent with this opinion.

*So ordered.*

MR. JUSTICE POWELL, with whom MR. JUSTICE BLACKMUN joins, concurring.

I join the Court's opinion, but add a word concerning the Act's domestic reporting requirements.

The Act confers broad authority on the Secretary to require reports of domestic monetary transactions from the financial institutions and parties involved. 31 U. S. C. §§ 1081 and 1082. The implementing regulations, however, require only that the financial institution "file a report on each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institution, which involves a *transaction in currency of more than $10,000.*" 31 CFR § 103.22 (italics added). As the Court properly recognizes, we must analyze plaintiffs' contentions in the context of the Act as narrowed by the regulations. *Ante,* at 64. From this perspective, I agree that the regulations do not constitute an impermissible infringement of any constitutional right.

A significant extension of the regulations' reporting requirements, however, would pose substantial and difficult constitutional questions for me. In their full reach, the reports apparently authorized by the open-ended language of the Act touch upon intimate areas of an individual's personal affairs. Financial transactions can reveal much about a person's activities, associations,

and beliefs. At some point, governmental intrusion upon these areas would implicate legitimate expectations of privacy. Moreover, the potential for abuse is particularly acute where, as here, the legislative scheme permits access to this information without invocation of the judicial process. In such instances, the important responsibility for balancing societal and individual interests is left to unreviewed executive discretion, rather than the scrutiny of a neutral magistrate. *United States* v. *U. S. District Court,* 407 U. S. 297, 316–317 (1972). As the issues are presently framed, however, I am in accord with the Court's disposition of the matter.

MR. JUSTICE DOUGLAS, dissenting.

I

The Court expresses a doubt that the California Bankers Association has standing to litigate the claims it asserts. That doubt, however, should be dissipated by our decisions.

*Sierra Club* v. *Morton,* 405 U. S. 727, 739, stated unequivocally that "an organization whose members are injured may represent those members in a proceeding for judicial review."

Appellants in No. 72–1196 are a national bank, a bank customer and depositor, a membership organization which is a customer of banks and receives money through banks for its members, a businessman who has engaged in and expects to engage in foreign financial transactions, and individuals having interests in or authority over foreign bank accounts. There can hardly be any doubt that these persons—at least the individuals and the membership organization—have standing. I think the same is true of the national bank in No. 72–1196 and the California Bankers Association in No. 72–985.

The claims the associations litigate in these cases are not only those of its members but also those of the depositors of those member banks. This will cost the banks, it is estimated, over $6 million a year. Certainly that is enough to give the banks standing. Moreover, they must spy on their customers. The Bank Secrecy Act requires banks to record and retain the details of their customers' financial lives. In *Pierce* v. *Society of Sisters,* 268 U. S. 510, the Court upheld the right of a representative litigant, a parochial school, to have standing to raise questions pertaining to the rights of parents, guardians, and children. See *Barrows* v. *Jackson,* 346 U. S. 249, 257. In *Eisenstadt* v. *Baird,* 405 U. S. 438, we upheld the standing of a distributor of contraceptives to assert rights of unmarried persons, since they were denied "a forum in which to assert their own rights." *Id.,* at 446. The question of standing has been variously described. But the "gist" of the question, we said in *Baker* v. *Carr,* 369 U. S. 186, 204, was whether the party has "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues." There is that "concrete adverseness" here; and that doubtless is the reason the Solicitor General does not raise the question which the Court now stirs.

II .

The Act has as its primary goal the enforcement of the criminal law.[1] The recordkeeping requirements orig-

---

[1] The House Report, No. 91–975, p. 10, states:

"Petty criminals, members of the underworld, those engaging in 'white collar' crime and income tax evaders use, in one way or another, financial institutions in carrying on their affairs."

That was the reason for requiring the report of large domestic cash transactions. "Criminals deal in money—cash or its equivalent. The deposit and withdrawal of large amounts of currency or

inated according to Congressman Patman, author of the measure, with the Department of Justice and the Internal Revenue Service in response to two problems: (1) "A trend was developing in the larger banks away from their traditional practices of microfilming all checks drawn on them." 116 Cong. Rec. 16953. (2) As respects the identification of depositors, "[a] typical example might involve a situation where a person with a criminal reputation holds an account but does not personally make deposits or withdrawals." *Ibid.*

The purpose of the Act was to give the Secretary of the Treasury "primary responsibility" under Title II "to see to it that criminals do not take undue advantage

---

its equivalent (monetary instruments) under unusual circumstances may betray a criminal activity. The money in many of these transactions may represent anything from the proceeds of a lottery racket to money for the bribery of public officials." *Id.*, at 11.

A sponsor on the floor of the House stated: "With respect to full financial recordkeeping, the problem can be simply stated; in the past decade, as organized crime and criminals have become more sophisticated, more and greater use has been made by criminal elements of our Nation's financial institutions. Law enforcement officials believe that an effective attack on organized crime requires the maintenance of adequate and appropriate records by financial institutions." 116 Cong. Rec. 16950.

Congressman Patman, author of the bill, stated: "This is really a bill which, if enacted into law, will be the longest step in the direction of stopping crime than any other we have had before this Congress in a long time." *Id.*, at 16951.

While it started with a different objective, it was changed to serve an additional purpose: "We also discovered that secret foreign bank accounts were not the only criminal activities related to the banking field. The major law enforcement authority—the Justice Department—of the U. S. Government called our attention to the urgent need for regulations which would make uniform and adequate the present recordkeeping practices, or lack of recordkeeping practices, by domestic banks and other financial institutions." *Id.*, at 16952.

of international trade and go undetected and unpunished." *Id.*, at 16954. He added: "I would be the first to admit that this legislation does not provide perfect crime prevention. However, it is felt that the legislation will substantially increase the risk of discovery of any criminal who undertakes to hide his activity behind foreign secrecy." *Id.*, at 16955.

The same purpose was reflected in the Senate. Senator Proxmire, the author of the Senate version of the bill, stated: "[T]he purpose of the bill is to provide law enforcement authorities with greater evidence of financial transactions in order to reduce the incidence of white-collar crime." [2] *Id.*, at 32627.

Customers have a constitutionally justifiable expectation of privacy in the documentary details of the financial transactions reflected in their bank accounts. That wall is not impregnable. Our Constitution provides the procedures whereby the confidentiality of one's financial affairs may be disclosed.

## A

*First*, as to the recordkeeping requirements,[3] their announced purpose is that they will have "a high degree of usefulness in criminal, tax, or regulatory investigations, or proceedings," 12 U. S. C. §§ 1829b (a)(2), 1953 (a). The duty of the bank or institution is to microfilm or otherwise copy every check, draft, or similar instrument drawn on it or presented to it for payment and to keep

---

[2] The Senate Report, No. 91–1139, is replete with the same philosophy. See pp. 1, 5, 7, 8.

[3] The Act authorizes the Secretary to issue regulations to carry out its purposes, 12 U. S. C. § 1829b (b). It empowers him to define institutions or persons affected, 12 U. S. C. §§ 1953 (a), (b)(5), to make exceptions, exemptions, or other special arrangements, 12 U. S. C. §§ 1829b (c), (f); to seek injunctions, 12 U. S. C. § 1954; and to assess and collect civil penalties, 12 U. S. C. § 1955.

a record of each one "received by it for deposit or collection," 12 U. S. C. §§ 1829b (d)(1) and (2). The retention is for up to six years unless the Secretary determines that "a longer period is necessary," 12 U. S. C. § 1829b (g). The regulations[4] issued by the Secretary

[4] Title 31 CFR § 103.34 at the time this litigation was commenced provided that banks shall:

"(a) ... secure and maintain a record of the taxpayer identification number of the person maintaining the account; or in the case of an account of one or more individuals, such bank shall secure and maintain a record of the social security number of an individual having a financial interest in that account.

"(b) Each bank shall, in addition, retain either the original or a microfilm or other copy or reproduction of each of the following:

"(1) Each document granting signature authority over each deposit or share account;

"(2) Each statement, ledger card or other record on each deposit or share account, showing each transaction in, or with respect to, that account;

"(3) Each check, clean draft, or money order drawn on the bank or issued and payable by it, except those drawn on accounts which can be expected to have drawn on them an average of at least 100 checks per month over the calendar year or on each occasion on which such checks are issued, and which are (i) dividend checks, (ii) payroll checks, (iii) employee benefit checks, (iv) insurance claim checks, (v) medical benefit checks, (vi) checks drawn on governmental agency accounts, (vii) checks drawn by brokers or dealers in securities, (viii) checks drawn on fiduciary accounts, (ix) checks drawn on other financial institutions, or (x) pension or annuity checks;

"(4) Each item other than bank charges or periodic charges made pursuant to agreement with the customer, comprising a debit to a customer's deposit or share account, not required to be kept, and not specifically exempted, under subparagraph (b)(3) of this section;

"(5) Each item, including checks, drafts, or transfers of credit, of more than $10,000 remitted or transferred to a person, account or place outside the United States;

"(6) A record of each remittance or transfer of funds, or of currency, other monetary instruments, checks, investment securities,

show the depth and extent of the quicksand in which our financial institutions must now operate.[5]

It is estimated that a minimum of 20 billion checks—and perhaps 30 billion—will have to be photocopied and that the weight of these little pieces of paper will approximate 166 million pounds a year.[6]

It would be highly useful to governmental espionage to have like reports from all our bookstores, all our hard-

---

or credit, of more than $10,000 to a person, account or place outside the United States;

"(7) Each check or draft in an amount in excess of $10,000 drawn on or issued by a foreign bank, purchased, received for credit or collection, or otherwise acquired by the bank;

"(8) Each item, including checks, drafts or transfers of credit, of more than $10,000 received directly and not through a domestic financial institution, by letter, cable or any other means, from a person, account or place outside the United States;

"(9) A record of each receipt of currency, other monetary instruments, checks, or investment securities, and of each transfer of funds or credit, of more than $10,000 received on any one occasion directly and not through a domestic financial institution, from a person, account or place outside the United States; and

"(10) Records prepared or received by a bank in the ordinary course of business, which would be needed to reconstruct a demand deposit account and to trace a check deposited in such account through its domestic processing system or to supply a description of a deposited check. This subparagraph shall be applicable only with respect to demand deposits." 37 Fed. Reg. 6914.

During this litigation the above provision was amended by the Secretary making it unnecessary to microfilm copies of checks "drawn for $100 or less," 31 CFR § 103.34 (b)(3) (1973). Since banks must copy all checks it is hard to see how this new exemption is meaningful.

[5] Like requirements are placed on brokers and dealers in securities, 31 CFR § 103.35.

[6] Hearings on Foreign Bank Secrecy and Bank Records (H. R. 15073) before the House Committee on Banking and Currency, 91st Cong., 1st and 2d Sess., 320 (1969–1970).

ware and retail stores, all our drugstores. These records too might be "useful" in criminal investigations.

One's reading habits furnish telltale clues to those who are bent on bending us to one point of view. What one buys at the hardware and retail stores may furnish clues to potential uses of wires, soap powders, and the like used by criminals. A mandatory recording of all telephone conversations would be better than the recording of checks under the Bank Secrecy Act, if Big Brother is to have his way. The records of checks—now available to the investigators—are highly useful. In a sense a person is defined by the checks he writes. By examining them the agents get to know his doctors, lawyers, creditors, political allies, social connections, religious affiliation, educational interests, the papers and magazines he reads, and so on *ad infinitum*. These are all tied to one's social security number; and now that we have the data banks, these other items will enrich that storehouse and make it possible for a bureaucrat—by pushing one button—to get in an instant the names of the 190 million Americans who are subversives or potential and likely candidates.

It is, I submit, sheer nonsense to agree with the Secretary that *all bank records of every citizen* "have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings." That is unadulterated nonsense unless we are to assume that every citizen is a crook, an assumption I cannot make.

Since the banking transactions of an individual give a fairly accurate account of his religion, ideology, opinions, and interests, a regulation impounding them and making them automatically available to all federal investigative agencies is a sledge-hammer approach to a problem that only a delicate scalpel can manage. Where fundamental personal rights are involved—as is true when as here the

Government gets large access to one's beliefs, ideas, politics, religion, cultural concerns, and the like—the Act should be "narrowly drawn" (*Cantwell* v. *Connecticut*, 310 U. S. 296, 307) to meet the precise evil.[7] Bank accounts at times harbor criminal plans. But we only rush with the crowd when we vent on our banks and their customers the devastating and leveling requirements of the present Act. I am not yet ready to agree that America is so possessed with evil that we must level all constitutional barriers to give our civil authorities the tools to catch criminals.

Heretofore this Nation has confined compulsory record-keeping to that required to monitor either (1) the record-keeper, or (2) his business. *Marchetti* v. *United States,* 390 U. S. 39, and *United States* v. *Darby,* 312 U. S. 100, are illustrative. Even then, as Mr. Justice Harlan writing for the Court said, they must be records that would "customarily" be kept, have a "public" rather than a private purpose, and arise out of an " 'essentially non-criminal and regulatory area of inquiry.' " *Marchetti* v. *United States, supra,* at 57.

Those requirements are in no way satisfied here, and yet there is saddled upon the banks of this Nation an estimated bill of over $6 million a year to spy on their customers.

---

[7] And see *Roe* v. *Wade,* 410 U. S. 113, 155; *Police Dept. of Chicago* v. *Mosley,* 408 U. S. 92, 101; *Gooding* v. *Wilson,* 405 U. S. 518, 522; *Shuttlesworth* v. *Birmingham,* 394 U. S. 147, 151; *Cameron* v. *Johnson,* 390 U. S. 611, 617; *Zwickler* v. *Koota,* 389 U. S. 241, 250; *Whitehill* v. *Elkins,* 389 U. S. 54, 62; *Ashton* v. *Kentucky,* 384 U. S. 195, 201; *Elfbrandt* v. *Russell,* 384 U. S. 11, 18.

The same view is often expressed in concurring opinions. See *Doe* v. *Bolton,* 410 U. S. 179, 216 (DOUGLAS, J., concurring); *Gregory* v. *Chicago,* 394 U. S. 111, 119 (Black, J., concurring); *United States* v. *Robel,* 389 U. S. 258, 270 (BRENNAN, J., concurring in result).

## B

*Second*, as to the *reporting* provisions of the Act, they require disclosure of two types of foreign financial transactions and relationships. One provision requires a *report* of transportation into or out of the country of monetary instruments exceeding $5,000.[8] Another requires parties to any transaction or relationship with "a foreign financial agency" to make such reports or make and keep such records as the Secretary may require.[9] Civil [10] and criminal [11] penalties are sanctions behind these *reporting* provisions.

The Act also requires the Secretary to make the *reported information* concerning transactions "available for a purpose consistent with the provisions of this chapter to any other department or agency of the Federal Government" upon request.[12] And to overcome any claims of self-incrimination it requires the grant of use immunity.[13]

---

[8] 31 U. S. C. § 1101.

[9] 31 U. S. C. § 1121. The Secretary requires reports in yearly tax returns of any "financial interest in, or signature or other authority over, a bank, securities or other financial account in a foreign country," 31 CFR § 103.24.

[10] 31 U. S. C. §§ 1056, 1102–1103; 31 CFR §§ 103.47–103.48.

[11] 31 U. S. C. §§ 1058–1059; 31 CFR § 103.49.

[12] 31 U. S. C. § 1061. The regulations read as follows:

"The Secretary may make any information set forth in any report received pursuant to this part available to any other department or agency of the United States upon the request of the head of such department or agency, made in writing and stating the particular information desired, the criminal, tax or regulatory investigation or proceeding in connection with which the information is sought and the official need therefor." 31 CFR § 103.43.

[13] 31 U. S. C. § 1060. The Court in *Kastigar* v. *United States*, 406 U. S. 441, held that "use immunity" satisfies the Self-Incrimination Clause of the Fifth Amendment. I disagreed then and persist in my view that it is "transactional" immunity, not "use" immunity,

As respects domestic transactions the Secretary established two *reporting* requirements. (1) Routine reports are, with some exceptions, required concerning any transaction of more than $10,000 in currency from each financial institution involved.[14] The signature of at least one principal party to the transaction is required.[15] (2) The Secretary at the time of the trial reserved the right to grant exemptions from the requirements, impose additional recordkeeping or reporting requirements authorized by statute, or otherwise modify, the requirements of this part.[16]

We said in *Katz* v. *United States*, 389 U. S. 347, 351–352: "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. . . . But what he seeks to pre-

_____

that is required to lift this constitutional protection. See *id.*, at 462–467 (dissenting opinion). But since "use" immunity is "the law" of the present Court—though I doubt if it can long survive—I do not write this dissent against the narrow immunity that is granted.

[14] 31 CFR § 103.22.

[15] 31 U. S. C. § 1082.

[16] At that time 31 CFR § 103.45 read as follows: "(a) The Secretary, in his sole discretion, may by written order or authorization make exceptions to, grant exemptions from, impose additional recordkeeping or reporting requirements authorized by statute, or otherwise modify, the requirements of this part. Such exceptions, exemptions, requirements or modifications may be conditional or unconditional, may apply to particular persons or to classes of persons, and may apply to particular transactions or classes of transactions. They shall, however, be applicable only as expressly stated in the order or authorization, and they shall be revocable in the sole discretion of the Secretary.

"(b) The Secretary shall have the authority to further define all terms used herein."

Since then, the language "impose additional recordkeeping or reporting requirements authorized by statute, or otherwise modify" has been deleted from § 103.45.

serve as private, even in an area accessible to the public, may be constitutionally protected." As stated in *United States* v. *White*, 401 U. S. 745, 752, the question is "what expectations of privacy" will be protected by the Fourth Amendment "in the absence of a warrant." A search and seizure conducted without a warrant is *per se* unreasonable, subject to "jealously and carefully drawn" exceptions, *Jones* v. *United States*, 357 U. S. 493, 499. One's bank accounts are within the "expectations of privacy" category. For they mirror not only one's finances but his interests, his debts, his way of life, his family, and his civic commitments. There are administrative summonses for documents, cf. *Camara* v. *Municipal Court*, 387 U. S. 523; *See* v. *City of Seattle*, 387 U. S. 541. But there is a requirement that their enforcement receive judicial scrutiny and a judicial order, *United States* v. *U. S. District Court*, 407 U. S. 297, 313–318. As we said in that case, "The Fourth Amendment does not contemplate the executive officers of Government as neutral and disinterested magistrates. Their duty and responsibility are to enforce the laws, to investigate, and to prosecute. . . . But those charged with this investigative and prosecutorial duty should not be the sole judges of when to utilize constitutionally sensitive means in pursuing their tasks. The historical judgment, which the Fourth Amendment accepts, is that unreviewed executive discretion may yield too readily to pressures to obtain incriminating evidence and overlook potential invasions of privacy and protected speech." *Id.,* at 317.

Suppose Congress passed a law requiring telephone companies to record and retain all telephone calls and make them available to any federal agency on request. Would we hesitate even a moment before striking it down? I think not, for we condemned in *United States* v. *U. S. District Court* "the broad and unsuspected gov-

ernmental incursions into conversational privacy which electronic surveillance entails." *Id.,* at 313.

A checking account, as I have said, may well record a citizen's activities, opinion, and beliefs as fully as transcripts of his telephone conversations.

The Fourth Amendment warrant requirements may be removed by constitutional amendment but they certainly cannot be replaced by the Secretary of the Treasury's finding that certain information will be highly useful in "criminal, tax, or regulatory investigations or proceedings." 12 U. S. C. § 1951 (b).

We cannot avoid the question of the constitutionality of the reporting provisions of the Act and of the regulations by saying they have not yet been applied to a customer in any criminal case. Under the Act and regulations the reports go forward to the investigative or prosecuting agency on written request without notice to the customer. Delivery of the records without the requisite hearing of probable cause [17] breaches the Fourth Amendment.

I also agree in substance with my Brother BRENNAN'S view that the grant of authority by Congress to the Secretary of the Treasury is too broad to pass constitutional muster. This legislation is symptomatic of the

---

[17] A criminal prosecution in this country for not reporting an overseas transaction is still a criminal prosecution under the Bill of Rights; and to these the Fourth Amendment has been applicable from the beginning. Cases of immigration officers stopping people at the border who are leaving or entering the country are obviously inapposite and certainly the Court cannot be serious in saying that the monetary value of the article being seized is relevant to whether the search and seizure without a warrant was constitutional. As said in *Katz* it is "persons" not "places" that the Fourth Amendment protects; and it would labor the point to engage in lengthy argument that "things" as well as "places" are not the object of the Fourth Amendment's concerns.

slow eclipse of Congress by the mounting Executive power. The phenomenon is not brand new. It was reflected in *Schechter Corp.* v. *United States,* 295 U. S. 495. *United States* v. *Robel,* 389 U. S. 258, is a more recent example. *National Cable Television Assn.* v. *United States,* 415 U. S..336, and *FPC* v. *New England Power Co.,* 415 U. S. 345, are even more recent. These omnibus grants of power allow the Executive Branch to make the law as it chooses in violation of the teachings of *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579, as well as *Schechter,* that lawmaking is a congressional, not an Executive, function.

MR. JUSTICE BRENNAN, dissenting.

I concur in Parts I and II–A of MR. JUSTICE DOUGLAS' opinion. As to the Act's foreign and domestic reporting requirements, however, I see no need to address the independent constitutional objections the plaintiffs below attempt to raise. The reporting requirements are inseparable from—and in some cases considerably broader than—the recordkeeping requirements. Thus, since in my view the recordkeeping provisions unconstitutionally vest impermissibly broad authority in the Secretary of the Treasury, see *United States* v. *Robel,* 389 U. S. 258, 269 (1967) (BRENNAN, J., concurring in result), the reporting provisions, too, are invalid.

The symbiotic nature of the recordkeeping and reporting requirements is clearly manifested in the expressions of congressional purpose found in 12 U. S. C. § 1951 (b) and 31 U. S. C. § 1051, which lay down blanket commands that "records" and "reports" be required where they "have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings."

One example of this interdependence may be found in 12 U. S. C. §§ 1951–1953, which apply to "any uninsured

bank or uninsured institution," terms which are themselves not defined in the Act. Section 1953 authorizes the Secretary to require the keeping of "any records or evidence of any type" so long as he may require them of insured banks. Section 1952 authorizes him to require "the making of appropriate reports by uninsured banks or uninsured institutions of any type with respect to their ownership, control, and managements and any changes therein." As appears from the legislative history, these provisions work in tandem, permitting the Secretary to detect instances of the use of sham or illegal transactions in which the institutional party is merely an alter ego of the customer it purportedly services. See S. Rep. No. 91–1139, p. 3 (1970); Hearings on Foreign Bank Secrecy and Bank Records (H. R. 15073) before the House Committee on Banking and Currency, 91st Cong., 1st and 2d Sess., 10–14 (1969–1970). Neither provision would usefully aid the detection of such practices without the other.

Not only are the reporting and recordkeeping requirements functionally inseparable, but the reporting provisions impose additional requirements, thus adding to the power of the Secretary to invade individual rights. For instance, the reporting requirement for all transactions involving domestic financial institutions, 31 U. S. C. § 1081, authorizes the Secretary to require reports at any time and in any manner and detail, of any transaction that involves the "payment, receipt, or transfer of United States currency, or such other monetary instruments as the Secretary may specify." Although the Secretary has by regulation limited the meaning of "monetary instruments," 31 CFR § 103.11, and invoked the section only where the transaction involves more than $10,000, see 31 CFR § 103.22, this in no way alters the fundamental vice of the statute.

That vice, see concurring opinion in *United States* v. *Robel, supra,* is the delegation of power to the Secretary in broad and indefinite terms under a statute that lays down criminal sanctions and potentially affects fundamental rights. See *Bantam Books, Inc.* v. *Sullivan,* 372 U. S. 58 (1963); *Cantwell* v. *Connecticut,* 310 U. S. 296, 304–307 (1940). My view in *Robel* applies here:

> "Formulation of policy is a legislature's primary responsibility, entrusted to it by the electorate, and to the extent Congress delegates authority under indefinite standards, this policy-making function is passed on to other agencies, often not answerable or responsive in the same degree to the people. '[S]tandards of permissible statutory vagueness are strict ....' in protected areas. *NAACP* v. *Button,* 371 U. S., at 432. 'Without explicit action by lawmakers, decisions of great constitutional import and effect would be relegated by default to administrators who, under our system of government, are not endowed with authority to decide them.' *Greene* v. *McElroy,* 360 U. S. 474, 507." 389 U. S., at 276.

In the case of the Bank Secrecy Act, also potentially involving First, Fourth, and Fifth Amendment rights of the vast majority of our citizenry, it exceeds Congress' constitutional power of delegation to empower the Secretary of the Treasury to require whatever reports and records he believes to be possessed of a "high degree of usefulness" where the purpose is to further "criminal, tax, or regulatory investigations or proceedings."

MR. JUSTICE MARSHALL, dissenting.

Although I am in general agreement with the opinions of my Brothers DOUGLAS and BRENNAN, I believe it important to set forth what I view as the essential issue in these cases.

The purposes of the recordkeeping requirements of the Bank Secrecy Act are clear from the language of the legislation itself—to require the maintenance of records which will later be available for examination by the Government in "criminal, tax, or regulatory investigations or proceedings." See 12 U. S. C. §§ 1829b (a)(2) and 1951 (b). The maintenance of the records is thus but the initial step in a process whereby the Government seeks to acquire the private financial papers of the millions of individuals, businesses, and organizations that maintain accounts in banks and use negotiable instruments such as checks to carry out the financial side of their day-by-day transactions. In my view, this attempt to acquire private papers constitutes a search and seizure under the Fourth Amendment.

As this Court settled long ago in *Boyd* v. *United States,* 116 U. S. 616, 622 (1886), "a compulsory production of a man's private papers to establish a criminal charge against him . . . is within the scope of the Fourth Amendment to the Constitution . . . ." The acquisition of records in this case, as we said of the order to produce an invoice in *Boyd,* may lack the "aggravating incidents of actual search and seizure, such as forcible entry into a man's house and searching amongst his papers . . . ," *ibid.,* but this cannot change its intrinsic character as a search and seizure. We do well to recall the admonishment in *Boyd, id.,* at 635:

"It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure."

By compelling an otherwise unwilling bank to photocopy the checks of its customers, the Government has as much of a hand in seizing those checks as if it had forced

a private person to break into the customer's home or office and photocopy the checks there. See *Byars* v. *United States,* 273 U. S. 28 (1927). Compare *Burdeau* v. *McDowell,* 256 U. S. 465 (1921), with *Lustig* v. *United States,* 338 U. S. 74, 78–79 (Frankfurter, J.). See also *Corngold* v. *United States,* 367 F. 2d 1 (CA9 1966). Our Fourth Amendment jurisprudence should not be so wooden as to ignore the fact that through microfilming and other techniques of this electronic age, illegal searches and seizures can take place without the brute force characteristic of the general warrants which raised the ire of the Founding Fathers. See *Entick* v. *Carrington,* 19 How. St. Tr. 1029 (1765); *Stanford* v. *Texas,* 379 U. S. 476, 483–484 (1965). As we emphasized in *Katz* v. *United States,* 389 U. S. 347 (1967), the absence of any physical seizure of tangible property does not foreclose Fourth Amendment inquiry. *Id.,* at 352–353. The Fourth Amendment "governs not only the seizure of tangible items, but extends as well to the recording of oral statements . . . ." *Id.,* at 353. By the same logic, the Fourth Amendment should apply to the recording of checks mandated by the Act here. And such a massive and indiscriminate search and seizure, not only without a warrant but also without probable cause to believe that any evidence to be obtained is relevant to any investigation, is plainly inconsistent with the principles behind the Amendment. See *Stanford* v. *Texas, supra,* at 485–486; *Katz* v. *United States, supra,* at 356–359.

It is suggested that there is no seizure under the Fourth Amendment because the bank, which is required to create and maintain the record, is already a party to the transaction. See *ante,* at 52. Surely this is irrelevant to the question of whether a Government search or seizure is involved. The fact that one has disclosed private papers to the bank, for a limited purpose, within the context of

a confidential customer-bank relationship, does not mean that one has waived all right to the privacy of the papers. Like the user of the pay phone in *Katz v. United States,* who, having paid the toll, was "entitled to assume that the words he utters into the mouthpiece will not be broadcast to the world," 389 U. S., at 352, so the customer of a bank, having written or deposited a check, has a reasonable expectation that his check will be examined for bank purposes only—to credit, debit or balance his account—and not recorded and kept on file for several years by Government decree so that it can be available for Government scrutiny. See *United States v. First Nat. Bank of Mobile,* 67 F. Supp. 616 (SD Ala. 1946).

The majority argues that any Fourth Amendment claim is premature, since the Act itself only affects the keeping of records and in no way changes the law regarding acquisition of the records by the Government. I cannot agree. This attempt to bifurcate the acquisition of information into two independent and unrelated steps is wholly unrealistic. As the Government itself concedes, "banks have in the past voluntarily allowed law enforcement officials to inspect bank records without requiring the issuance of a summons." Brief for Appellees in Nos. 72–985 and 72–1196, p. 38. n. 19. Indeed, the Chief of the Organized Crime and Racketeering Section of the Criminal Division of the Justice Department told a Senate Subcommittee in 1972 that access by the FBI to bank records without process occurs "with some degree of frequency." Hearings to amend the Bank Secrecy Act (S. 3814 and S. 3828) before the Subcommittee on Financial Institutions of the Senate Committee on Banking, Housing and Urban Affairs, 92d Cong., 2d Sess., 114–115 (1972).

The plain fact of the matter is that the Act's record-keeping requirement feeds into a system of widespread

informal access to bank records by Government agencies and law enforcement personnel. If these customers' Fourth Amendment claims cannot be raised now, they cannot be raised at all, for once recorded, their checks will be readily accessible, without judicial process and without any showing of probable cause, to any of the several agencies that presently have informal access to bank records.

The Government suggests that the Act does not in any way preclude banks from refusing to allow informal access and insisting on the issuance of legal process before turning over a customer's financial records. Such a refusal, however, even if accompanied by notice to the customer with an opportunity for him to assert his constitutional claims, comes too late, for the seizure has already taken place. By virtue of the Act's recordkeeping requirement, copies of the customer's checks are already in the bank's files and amenable to process. The seizure has already occurred, and all that remains is the transfer of the documents from the agent forced by the Government to accomplish the seizure to the Government itself. Indeed, it is ironic that although the majority deems the bank customers' Fourth Amendment claims premature, it also intimates that once the bank has made copies of a customer's checks, the customer no longer has standing to invoke his Fourth Amendment rights when a demand is made on the bank by the Government for the records. See *ante*, at 53. By accepting the Government's bifurcated approach to the recordkeeping requirement and the acquisition of the records, the majority engages in a hollow charade whereby Fourth Amendment claims are to be labeled premature until such time as they can be deemed too late.

Nor can I accept the majority's analysis of the First Amendment associational claims raised by the American

Civil Liberties Union on behalf of its members who seek to preserve the anonymity of their financial support of the organization. The First Amendment gives organizations such as the ACLU the right to maintain in confidence the names of those who belong or contribute to the organization, absent a compelling governmental interest requiring disclosure. See *NAACP* v. *Alabama,* 357 U. S. 449 (1958). See also *Lamont* v. *Postmaster General,* 381 U. S. 301 (1965); *Gibson* v. *Florida Legislative Investigation Comm'n,* 372 U. S. 539 (1963); *Louisiana ex rel. Gremillion* v. *NAACP,* 366 U. S. 293 (1961); *Shelton* v. *Tucker,* 364 U. S. 479 (1960); *Bates* v. *Little Rock,* 361 U. S. 516 (1960); *United States* v. *Rumley,* 345 U. S. 41 (1953). It is certainly inconsistent with this long line of cases for the Government, absent any showing of need whatsoever, to require the bank with which the ACLU maintains an account to make and keep a microfilm record of all checks received by the ACLU and deposited to its account. The net result of this requirement, obviously, is an easily accessible list of all of the ACLU's contributors. And, given the widespread informal access to bank records by Government agencies, see *supra,* at 96–97, the existence of such a list surely will chill the exercise of First Amendment rights of association on the part of those who wish to have their contributions remain anonymous. The technique of examining bank accounts to investigate political organizations is, unfortunately, not rare. See, *e. g., Pollard* v. *Roberts,* 283 F. Supp. 248 (ED Ark.), aff'd *per curiam,* 393 U. S. 14 (1968); *United States Servicemen's Fund* v. *Eastland,* 159 U. S. App. D. C. 352. 488 F. 2d 1252 (1973).

First Amendment freedoms are "delicate and vulnerable." They need breathing space to survive. *NAACP* v. *Button,* 371 U. S. 415, 433 (1963). The threat of disclosure entailed in the existence of an easily accessible

list of contributors may deter the exercise of First Amendment rights as potently as disclosure itself. Cf. *ibid.* See also *United States Servicemen's Fund* v. *Eastland, supra,* at 365–368, 488 F. 2d, at 1265–1268. More importantly, however slight may be the inhibition of First Amendment rights caused by the bank's maintenance of the list of contributors, the crucial factor is that the Government has shown no need, compelling or otherwise, for the maintenance of such records. Surely the fact that some may use negotiable instruments for illegal purposes cannot justify the Government's running roughshod over the First Amendment rights of the hundreds of lawful yet controversial organizations like the ACLU. Congress may well have been correct in concluding that law enforcement would be facilitated by the dragnet requirements of this Act. Those who wrote our Constitution, however, recognized more important values.

I respectfully dissent.