# Constitutionality of Proposed Limitations on Tobacco Industry

Congress has the authority under the Constitution to impose significant new regulations on tobacco companies, including (1) restrictions on advertising and marketing of tobacco products that are tailored to prevent access to advertising by minors; (2) contingent monetary exactions, to be collected from tobacco companies if tobacco use by minors fails to meet prescribed targets; and (3) requirements that companies disclose certain documents to the public and to federal regulators

Consent by the tobacco companies to increased federal regulation, which those companies might grant in order to qualify for federally prescribed limits on liability, would permit Congress to establish additional restrictions on tobacco advertising that it could not impose directly.

May 13, 1998

STATEMENT BEFORE THE COMMITTEE ON THE JUDICIARY
UNITED STATES SENATE

Mr. Chairman, thank you for inviting the Department of Justice to testify regarding the constitutionality of limitations on the tobacco industry that are currently under consideration in the Senate. We begin by addressing Congress's constitutional authority to regulate the tobacco industry without that industry's consent. We will explain that, even in the absence of consent, the Congress may impose important restrictions on the tobacco industry in furtherance of the public health. Included among such permissible regulations are (1) meaningful restrictions on the advertising and marketing of tobacco products; (2) the direct imposition of "lookback" assessments; and (3) document disclosure requirements. We address these particular categories because some have questioned Congress's power in these areas. Finally, we address the benefits of obtaining industry consent.

I. *Congress Can Enact Comprehensive Tobacco Legislation Without the Industry's Consent*

Last September, the President announced five principal goals for comprehensive tobacco legislation. Those goals include:

* a comprehensive plan to reduce teen smoking, including the imposition of assessments that would increase cigarette prices by amounts necessary to meet youth smoking targets;

* express reaffirmation that the Food and Drug Administration ("FDA") has full authority to regulate tobacco products;

* changes in the way the tobacco industry does business, especially in the area of advertising directed at children;

* progress toward other critical public health goals, such as the expansion of smoking cessation and prevention programs and the reduction of secondhand smoke; and

* protection for tobacco farmers and their communities.

Certainly there would be significant advantages to having the tobacco industry participate in the nation's effort to reduce youth smoking, hence the President has indicated that he would prefer the industry do so. But Congress has ample authority to enact comprehensive tobacco legislation that achieves these crucial goals without the industry's consent.

For example, consistent with the Constitution, Congress may enact, without industry consent, provisions that would:

* impose assessments on all tobacco manufacturers that would increase the price of cigarettes by $1.10 per pack over five years;

* confirm full FDA authority;

* establish marketing and advertising restrictions that would track the FDA's regulation;

* impose extensive labelling and ingredient disclosure requirements;

* fund programs that would protect tobacco farmers and their communities;

* impose significant lookback assessments that would ensure continued reductions in youth smoking;

* establish licensing and registration provisions that would prevent the creation of a black market; and

* require disclosure of relevant, non-privileged documents.

The Department believes that Congress can and should pass a law that achieves all of the above objectives, with or without the industry's consent. Every day we delay, 3,000 more of our children take up smoking; at present rates, 1,000 of them will die prematurely as a result. Congress has the constitutional power to rewrite their future with a comprehensive tobacco bill.

II. *Congress or the FDA Can Impose Marketing Restrictions on the Tobacco Industry Without Its Consent*

A. *Direct Imposition of the FDA Regulations*

Under prevailing Supreme Court precedent, the government has the authority to impose restrictions on tobacco product advertising, where such restrictions are appropriately tailored to prevent access to advertising by minors, who may not lawfully purchase the advertised product. Thus, while there are certain advertising restrictions that may need industry consent in order to survive constitutional challenge, it is important not to lose sight of the important advertising restrictions—such as those set forth in the FDA regulation—that may be imposed directly.

Under the test set out by the Supreme Court in *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557 (1980), the threshold question is whether the regulated speech is "related to unlawful activity" or is misleading. *Id.* at 564. If so, the speech can be freely regulated by the government. Because children cannot lawfully purchase tobacco products, Congress may restrict tobacco advertising that promotes those unlawful transactions.

Tobacco advertising does, however, provide information to adults, who may lawfully purchase tobacco products. Thus, it is necessary to consider the remainder of the *Central Hudson* test in evaluating the constitutionality of restrictions on tobacco advertising. That test asks (1) "whether the asserted governmental interest is substantial;" (2) "whether the regulation directly advances the governmental interest asserted;" and (3) "whether [the regulation] is not more extensive than is necessary to serve that interest." *Id.* at 566. There is no question that the interest in protecting children from becoming addicted to tobacco products is substantial and that marketing restrictions such as those in the FDA's regulation advance that interest. That leaves only the last part of the test—the "fit."

This inquiry does not amount to a "least restrictive means" test. Instead, the Supreme Court's decisions require "reasonable" fit between the government's ends and the means chosen to accomplish those ends. *See Board of Trustees v. Fox*, 492 U.S. 469, 480 (1989). The fit need not be perfect, only reasonable; it need not be the single best disposition, only one whose scope is in proportion to the interest served. *See id.* Accordingly, a commercial speech restriction will fail the narrow-tailoring requirement *only* if it "burden[s] substantially more speech than necessary." *United States v. Edge Broad. Co.*, 509 U.S. 418, 430 (1993). Critically for present purposes, courts likely would find that a restriction is sufficiently tailored if it leaves open adequate alternative channels for the communication of commercial speech. *See Florida Bar v. Went for It, Inc.*, 515 U.S. 618, 632 (1995).

As we have argued in the pending litigation, the FDA's regulation falls within the permissible scope of the government's power. As the Supreme Court has made clear, "[t]he First Amendment's concern for commercial speech is based on the

informational function of advertising." *Central Hudson*, 447 U.S. at 563. The FDA regulations have been carefully tailored to preserve this informational function of tobacco advertising.

The FDA restrictions are also carefully tailored to achieve their end—reduction of tobacco product advertising to minors. Thus, the FDA regulation bars the use of image and color in the advertising of tobacco products but allows it in designated adult publications and facilities. It bans outdoor advertising—including so-called tombstone advertising—within 1,000 feet of schools and playgrounds, but allows tombstone advertising elsewhere. It prohibits brand-name sponsorship of athletic, social and cultural events, but permits sponsorship in company names. The regulation restricts those aspects of tobacco advertising that are most likely to be influential to minors while ensuring that adult publications and facilities are excepted from its reach and that basic product and price information will be generally available in other fora. For these reasons, the FDA regulation is fully constitutional.

We note that the Supreme Court's recent decision in *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996), is consistent with our analysis. There, the Court considered a broad ban on price advertising about alcohol products. A majority of the Court reaffirmed the continuing validity of the *Central Hudson* test in striking down the ban, and even Justice Stevens' arguably more protective approach did not purport to limit the ability of government to regulate advertising in a manner that is tailored to the legitimate interest in protecting those who are not lawful consumers of the product.

Indeed, the Court of Appeals for the Fourth Circuit recently applied the Court's decision in *44 Liquormart* in upholding a Baltimore city ordinance that substantially limited, but did not prohibit, the outdoor advertising of alcohol and tobacco products. *See Anheuser-Busch, Inc. v. Schmoke*, 101 F.3d 325 (4th Cir. 1996), *cert. denied*, 520 U.S. 1204 (1997); *Penn Adver. of Baltimore, Inc. v. Mayor of Baltimore*, 101 F.3d 332 (4th Cir. 1996), *cert. denied*, 520 U.S. 1204 (1997). The Fourth Circuit noted that, in contrast to the price advertising ban at issue in *44 Liquormart*, the Baltimore ordinance represented a tailored measure aimed at protecting minors who could not lawfully purchase tobacco or alcohol products. It was not a general prohibition aimed at keeping lawful consumers in the dark. We believe that this reasoning strongly supports the FDA regulation.

In light of these constitutional principles, Congress has the authority to impose significant restrictions on tobacco advertising in the absence of industry consent without infringing First Amendment rights. To that end, the Department believes that any comprehensive tobacco legislation must confirm FDA's authority to promulgate such regulations and must reaffirm the FDA's authority to have promulgated the advertising restrictions that are already on the books.

## B. *Making Additional Advertising Restrictions Conditional*

Certain advertising restrictions that are set forth in the June 20th resolution, as well as several of the bills before the Senate, go beyond those contained in the FDA regulation. These additional advertising restrictions raise significant constitutional concerns that are not presented by the FDA regulation. They would restrict more substantially *adults'* access to commercial information because they generally do not contain the important exceptions for adult facilities and publications, and for geographic areas not frequented by children, that help to make the FDA regulation constitutional. As a result, legislation that directly imposed these additional restrictions would be vulnerable to significant constitutional challenge.

We believe, however, that legislation could be crafted, consistent with the Constitution, in which manufacturers could agree to comply with the additional restrictions in exchange for certain benefits. Such an agreement could be accomplished through a protocol between a participating manufacturer and the federal government, in which, among other things, a manufacturer could choose to receive certain benefits, such as limitations on liability, in return for an agreement not to engage in certain additional types of advertising of tobacco products. Although such provisions would present novel constitutional questions, we believe that they should be upheld.

## C. *Application of the Unconstitutional Conditions Doctrine*

In our view, the "unconstitutional conditions" doctrine should not bar the government from including the additional advertising restrictions in a properly structured protocol. In general, the doctrine prohibits the government from conditioning benefits, such as federal funding, on the recipient's willingness to forego the exercise of constitutional rights. There are strong arguments, however, that the doctrine should apply with less force in this unique context.

First, virtually every speech restriction that the Supreme Court has analyzed under the unconstitutional conditions doctrine has involved a limitation on fully protected speech. *See, e.g., FCC v. League of Women Voters,* 468 U.S. 364 (1984). A strong argument can be made that there is more room in the commercial speech context for a distinction to be drawn between "burdens" and "benefits" than there is in the non-commercial speech context. The greater "hardiness" of commercial speech, inspired as it is by the profit motive, makes it less likely to be "chilled" by overbroad legislation. *See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 771 n.24 (1976). This same hardiness makes it less likely that the offer of government benefits will impermissibly "coerce" commercial speakers into foregoing the exercise of First Amendment rights. Thus, offers of benefits that would be suspect if put forth

in exchange for restrictions on political speech should not be similarly suspect if put forth in exchange for restrictions on commercial speech.

Second, we believe that a protocol could offer what should properly be understood to constitute a constitutionally permissible "benefit" rather than a constitutionally suspect "burden." Such a protocol could be structured so that a manufacturer that elects not to participate in the protocol would be no worse off than it would have been in the absence of the offer of the "benefit." A protocol of this sort would be distinguishable from the provision invalidated in *44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484 (1996). There, the lead opinion explained that an otherwise unconstitutional prohibition on virtually all price advertising could not be justified as a permissible condition on a retailer's license to sell. That analysis should not bar the government from conditioning what could only be described as a benefit to the industry on a manufacturer's compliance with more limited advertising restrictions that are intended to serve a legitimate governmental interest.

As a result, although these are novel questions for which there is no clear precedent, we believe that legislation that contains the additional advertising restrictions in a conditional form can be drafted in a manner that should survive constitutional challenge. For example, a protocol between a participating manufacturer and the federal government, in which, among other things, the manufacturer chooses to accept certain limitations on liability in return for an agreement not to engage in the outdoor advertising of tobacco products, should survive constitutional challenge.

It is important to emphasize that our analysis of how the unconstitutional conditions doctrine should be applied in this context is predicated on the unique characteristics of commercial speech. A different analysis would apply to restrictions outside the commercial speech context, such as restrictions on lobbying by the tobacco industry. Therefore, we do not believe that Congress should enact legislation that includes any restrictions on political/noncommercial speech—whether imposed directly or conditionally. The inclusion of such restrictions would raise grave constitutional concerns.

## III. *Congress Can Impose Lookback Assessments Without the Industry's Consent*

### A. *Background*

A number of proposals for comprehensive tobacco legislation call for the imposition of "lookback" assessments from tobacco companies. Unlike the annual assessments, which apply regardless of the prevalence of youth smoking, lookback assessments are contingent and take effect only if reductions in tobacco use by minors fail to meet prescribed targets. There are two distinct types of possible lookback assessments, which could apply singly or in combination: industry-wide assessments based on aggregate figures for youth consumption of particular classes

of tobacco products, and company-specific assessments based on brand-by-brand youth consumption data.

Some observers have argued that the imposition of lookback assessments on tobacco companies that neither consented to the lookback regime nor violated specific marketing and distribution restrictions would violate rights guaranteed by the substantive component of the Due Process Clause of the Fifth Amendment, the Takings Clause, and the Bill of Attainder Clause.

We do not believe that these objections are well-founded. Properly designed lookback assessments, in our view, should survive constitutional challenge under current doctrine.

## B. *Substantive Due Process*

Several of the pending tobacco bills propose to collect annual assessments from tobacco companies. These annual assessments are designed to serve two principal purposes—increasing price to dampen youth consumption and supporting other government efforts to reduce this consumption (and to address its adverse health effects). We are confident that the imposition of annual assessments on tobacco companies would be upheld as a reasonable means of promoting these legitimate federal objectives.

Lookback assessments, triggered by evidence of persistently high tobacco use by minors, can be structured to serve many of the same purposes as the annual assessments and thus be integrally related to achieving the principal objectives of those assessments. Lookback provisions supplement the annual assessments in the event that the annual assessments prove to be insufficient to achieve Congress's goals. At the same time, they encourage the industry—which may be uniquely situated to develop innovative strategies—to take action to minimize youth smoking. Thus, lookback provisions that augment the annual assessments are no less reasonable than the annual assessments themselves, and would survive a challenge under the Supreme Court's substantive due process jurisprudence.

In·explaining the limited reach of substantive due process doctrine on legislation that regulates economic activity, the Supreme Court has stated that "legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and . . . the burden is on the one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976). The Supreme Court has upheld various federal assessments designed to generate revenues needed to address the costs of particular economic activities. In *Turner Elkhorn*, for example, the Court upheld federal legislation that imposed liability on coal operators to finance black lung benefits for miners who retired before enactment of that legislation. Similarly, in *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717 (1984), the Court upheld the imposition of liability

on employers to meet pension shortfalls attributable to employers' earlier withdrawals from multi-employer pension plans.

In other contexts, the Supreme Court has exhibited a similar reluctance to upset legislative judgments pertaining to the proper adjustment of the "burdens and benefits of economic life." In two such cases, *Alaska Fish Salting & By-Prods. Co. v. Smith*, 255 U.S. 44 (1921) (Holmes, J., writing for a unanimous Court), and *City of Pittsburgh v. Alco Parking Corp.*, 417 U.S. 369 (1974), the Court upheld against substantive due process challenges substantial excise taxes designed for the purpose of inhibiting disfavored business activities.

These decisions strongly support Congress's authority to impose lookback assessments without regard to company consent. The proposed lookback assessments for tobacco companies would raise fewer constitutional questions than the assessments at issue in *Turner Elkhorn* and *Pension Benefit Guaranty* because the lookback assessments would be strictly prospective in operation. Unlike the businesses that incurred liability under the schemes upheld in these cases, no tobacco company would have to pay a lookback assessment based on events that occurred prior to enactment of the comprehensive tobacco bill. In other respects, lookback provisions would operate in a manner similar to the retroactive black lung and pension assessments that the Court upheld in *Turner Elkhorn* and *Pension Benefit Guaranty*. Moreover, although the assessments are not an excise tax, because they would increase prices in order to reduce youth tobacco consumption, they could be sustained based on the analysis that *Alaska Fish Salting* and *City of Pittsburgh* relied upon to uphold excise taxes on the disfavored activities at issue there.

While some pending bills refer to lookback assessments as "penalties," we believe that this phrasing does not accurately describe their function or purpose. To the contrary, they are inherently regulatory in nature, creating salutary incentives, raising prices, and otherwise supporting further efforts to reduce youth consumption, where such consumption has not been reduced sufficiently without them.

Company-specific assessments are a rational and constitutional approach as well. Like industry-wide assessments, they provide salutary incentives for tobacco companies both to comply with direct statutory and regulatory restrictions on marketing to minors and to devise additional measures to reduce youth tobacco consumption, based upon the companies' unique expertise on the causes of such consumption. Indeed, company-specific assessments may be crucial to the effectiveness of the overall lookback scheme because they relieve free-rider problems. Without company-specific assessments, individual companies might have incentives to recruit new underage users at the expense of the entire industry. Company-specific lookback assessments also will help pay for the increased costs to society of high rates of youth smoking, at the expense of companies who profit the most from sales to minors. They may, in addition, contribute to further price

increases where the annual assessments failed to prompt sufficient reductions in youth consumption. Thus, company-specific lookback assessments that are designed to serve these purposes are not "arbitrary and irrational" and therefore do not violate the substantive due process doctrine.

Some have argued that tobacco manufacturers should be given the opportunity to argue that they are "innocent" and that high youth consumption rates are not attributable to company misdeeds or failure aggressively to fight youth tobacco consumption. *See, e.g., Bennis v. Michigan*, 516 U.S. 442, 469 (1996) (Stevens, J., dissenting) (criticizing deterrent rationale that state offered to justify the forfeiture of an innocent co-owner's interest in a car that the other co-owner used to commit a crime). This argument, however, does not respond at all to some of the purposes behind lookback assessments, including, for example, raising the price. Moreover, even considering only the deterrence rationale, lookback assessments would survive constitutional scrutiny. Applying current doctrine, a court would be likely to accept the rationality of legislative judgments (1) that an "innocent company" defense would unduly undermine the deterrent effect of lookback incentives, or (2) that an innocent company defense should not be recognized because companies with excessive youth smoking rates could always do more to reduce youth consumption.

## C. *The Just Compensation and Bill of Attainder Clauses*

Assertions that lookback assessments would violate the Just Compensation and Bill of Attainder Clauses are also unfounded. As Chief Justice Rehnquist observed for the Court in *Bennis*, when the federal government acquires property through the lawful exercise of powers other than the power of eminent domain, there is no requirement that it pay compensation. 516 U.S. at 454. Furthermore, the Supreme Court has stated that "it would be surprising indeed to discover" that economic regulation, though sustainable against a due process challenge, would nevertheless be found to violate the Takings Clause. *Concrete Pipe & Prods. of Cal. Inc. v. Construction Laborers Pension Trust*, 508 U.S. 602, 641 (1993).

The Bill of Attainder Clause prohibits the singling out of particular individuals or entities for legislatively mandated punishment. *E.g., United States v. Brown*, 381 U.S. 437 (1965). The lookback provisions would apply to all manufacturers of tobacco products and would operate as one component of comprehensive industry-wide reform legislation. Legislation of this scope does not single out individuals or entities for adverse treatment within the meaning of the Bill of Attainder Clause. Moreover, as stated in the earlier discussion of substantive due process issues, there is no apparent need for Congress to structure lookback assessments as punishments for tobacco company misconduct.

IV. *Congress Can Impose Document Disclosure Requirements on the Tobacco Industry Without Its Consent*

Many of the proposed bills, as well as the June 20th resolution, include provisions that would require tobacco manufacturers to disclose corporate documents to the public and to make additional document disclosures to regulatory agencies, such as the FDA. These contemplated provisions often, but do not always, make consent to these disclosure requirements a condition of a participating manufacturer's receipt of certain specified benefits. Although some have argued that document disclosure requirements violate the Takings and Due Process Clauses, as well as Fourth Amendment rights, we believe that such requirements may be imposed consistent with the Constitution even in the absence of provisions conditioning benefits on industry consent.

As an initial matter, it is our understanding that any document disclosure provision, even if imposed directly, would be limited in application to those entities that wished to continue manufacturing tobacco products. In this respect, even seemingly mandatory document disclosure requirements are in an important sense "consensual" for purposes of evaluating challenges to them brought under the Takings or Due Process Clauses.

The leading case concerning the application of the Takings Clause to federal document disclosure requirements is *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984). There, Monsanto sued the Environmental Protection Agency ("EPA") for the Agency's use and disclosure of health, safety, and environmental data that state law protected as trade secrets but that the company had submitted in order to register its products for sale within the United States as required by the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"). The Court found that Monsanto was entitled to compensation for EPA's use and disclosure of the information that the company had submitted between 1972 to 1978, when FIFRA contained an explicit assurance that registration data would be kept confidential. *Id.* at 1011. On the other hand, the Court rejected Monsanto's claim to compensation for EPA's use and disclosure of the data that the company had submitted before 1972 and after 1978, periods during which FIFRA contained no such assurance.

The Court specifically rejected Monsanto's argument that FIFRA's imposition of a data-disclosure requirement, as a precondition to the registration of pesticides for sale within the United States, represented an unconstitutional condition on access to a valuable government benefit:

> [A]s long as Monsanto is aware of the conditions under which the
> data are submitted, and the conditions are rationally related to a
> legitimate Government interest, a voluntary submission of data in

> exchange for the economic [benefit] of a registration can hardly
> be called a taking.

*Id.* at 1007.

*Ruckelshaus* suggests that continued authorization to market tobacco products within the United States constitutes a valuable governmental benefit that may be conditioned on document disclosure requirements. Following the enactment of federal legislation making these terms clear, any tobacco company that continued to sell its products within the United States would be treated as having accepted the federal disclosure program. *See id.* at 1007 n.11.

Moreover, the takings issue arose in *Ruckelshaus* only because federal law required the public disclosure of material that state law would clearly have protected as trade secrets. Some tobacco proposals are further insulated from a takings challenge because they require material that state law protects as trade secrets (or under attorney-client privilege) to be disclosed only to government officials on a confidential basis. The takings claim would then have to be either that (1) the documents themselves—rather than the proprietary information contained therein—constituted property that had been taken by federal law, or (2) the costs of complying with the disclosure provisions were sufficiently burdensome as to constitute a taking. Takings claims of these latter types are unlikely to succeed.

The D.C. Circuit's ruling that a federal statute requiring former President Nixon to make available his presidential papers constituted a taking is not to the contrary. *Nixon v. United States*, 978 F.2d 1269 (D.C. Cir. 1992). *Ruckelshaus* suggests that a far different analysis should apply where, as here, the disclosure requirement is a legitimate condition on a regulated industry's receipt of a valuable governmental benefit—the continued authority to participate in the United States tobacco market. In addition, in contrast to the Nixon papers, it is doubtful that exclusive company access to the corporate records of the tobacco industry would have much value apart from the trade secret information contained therein, which we presume would not be made available to the public. Finally, it should be noted that many of the documents that would be subject to production have already been produced in the course of discovery in prior or pending litigation, and that such documents would be subject to discovery in future litigation.

We also believe that a due process challenge to the document disclosure provisions would fail. Such a provision would likely be assessed as economic regulation, which is ordinarily accorded a substantial presumption of constitutionality. *See Turner Elkhorn*, 428 U.S. at 15. Due Process, as applied to statutes imposing or adjusting economic burdens, generally requires no more than "a legitimate legislative purpose furthered by [a] rational means." *Pension Benefit Guarantee*, 467 U.S. at 729. Thus, so long as the disclosure requirement, as well as the attendant compliance costs, are rationally related to a legitimate governmental interest,

as we believe they would be, they should survive whatever due process challenge may arise.

Finally, we do not believe that the Fourth Amendment would bar the federal government from requiring manufacturers to submit a substantial number of their corporate records to a designated depository that would be open to public inspection. The Supreme Court has consistently upheld broad corporate disclosure requirements against Fourth Amendment challenge, whether such disclosure has been mandated by subpoena or by general legislation. *See California Bankers Ass'n v. Schultz*, 416 U.S. 21 (1974) (upholding the Bank Secrecy Act); *Oklahoma Press Publ'g Co. v. Walling*, 327 U.S. 186 (1946) (upholding a subpoena). In so doing, the Supreme Court has explained that

> corporations can claim no equality with individuals in the enjoyment of a right to privacy. They are endowed with public attributes. They have a collective impact upon society, from which they derive the privilege of acting as artificial entities. The Federal Government allows them the privilege of engaging in interstate commerce. . . . Even if one were to regard the request for information in this case as caused by nothing more than official curiosity, nevertheless law-enforcing agencies have a legitimate right to satisfy themselves that corporate behavior is consistent with law and the public interest.

*California Bankers Ass'n*, 416 U.S. at 65–66 (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 651–52 (1950)) (citations omitted).

In sum, the industry's consent is not needed in order to permit the federal government to enact disclosure requirements on the tobacco industry. So long as the requirement would reasonably serve the federal government's regulatory interests and would not require tobacco companies to disclose documents that are privileged or to make public material that contains trade secrets, we see little risk of a successful constitutional challenge.

## V. *The Advantages of Participation by the Industry*

Although Congress can enact effective tobacco legislation without industry consent, participation of the tobacco industry would have advantages. The tobacco industry is in the best position to change its business practices in a manner that keeps cigarettes away from children. Moreover, consent of the regulated entity would substantially minimize the likelihood that any constitutional challenge would succeed. Further, some restrictions, in particular certain advertising restrictions that go beyond the FDA regulation, may depend upon consent in order to survive constitutional review. Finally, there are other advantages to obtaining industry consent, such as reducing the likelihood of protracted legal challenges and minimizing delay in implementing the provisions of the Act.

Some of the bills before Congress seek to accomplish the reduction in litigation through provisions that would forbid tobacco companies from challenging the bill's advertising restrictions or that would withdraw benefits from companies if they brought a legal challenge to the restrictions. We do not believe that these are sound approaches because there is a significant chance that a court would invalidate such provisions as a restriction on fully protected First Amendment activity—namely, constitutional litigation.

We note, however, that a protocol could provide that manufacturers would receive benefits *only if* they were subject to certain legal requirements; thus, even if the provisions that directly imposed certain advertising restrictions were struck down, the manufacturers could still be made subject to those restrictions, which could be included as independent terms of the protocol. Manufacturers who signed on to the protocol would therefore have little incentive to challenge the direct imposition of the restrictions.

It is important to stress that consent is not a panacea and that even voluntary provisions would still be open to substantial challenge. We believe, however, that securing the industry's cooperation would reduce the risks of protracted litigation.

## VI. *Conclusion*

The conclusion that should be drawn from this discussion is that there are advantages to having the tobacco industry's participation in the nation's effort to reduce youth smoking, but that Congress should not allow the lack of such consent to impede it from legislating to achieve the goals that the President has set forth for comprehensive tobacco legislation. Even in the absence of consent, Congress can increase the price of cigarettes, impose appropriately tailored, but still significant, advertising restrictions on the industry, and achieve the important public health goals that the President has identified.

DAVID W. OGDEN
*Counselor to the Attorney General*

RANDOLPH D. MOSS
*Deputy Assistant Attorney General*
*Office of Legal Counsel*